IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal No. 21-CR-000287-TNM |
| | : | |
| | : | |
| HUNTER SEEFRIED, | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT HUNTER SEEFRIED'S MOTION
FOR DOWNWARD VARIANCE AND SENTENCING MEMORANDUM**

**I.    Introduction**

On January 6, 2021, Hunter Seefried was just 7 weeks past his 21st birthday. But January 6th is a day that is forever etched in his mind and one he wishes he could relive so that he could set things right.  If he could, Hunter would start the day by sticking to his position when he earlier told his father that he did not want to go to the rally in the Capitol.  He gave in because his father, Kevin Seefried, kept pushing his desire to go and to have his family attend with him. Kevin Seefried rules over his home and all who live in it with an "it's my way or the highway" attitude.  If only he could relive that day, Hunter also would have rebuffed his father's decision that Hunter, his mother, and his then-girlfriend should follow him and join in with the crowds going to the Capitol after they left the rally at the Ellipse instead of going home after lunch  as they originally planned. And; more importantly, if Hunter could relive that day, he would have carried himself in the manner in which he had for about 99 % of the first 21 years of his young life.  Having not followed his gut and instead

following his father's lead, Hunter now lives with a great sense of shame and an equal amount of remorse for his criminal behavior on January 6, 2021.

Hunter knows that he cannot take back his actions of January 6th, but he intends to make up for his criminal behavior that day by leading a life driven by concern for, and kindness to others, a life of peacefulness, decency, and humility – all the attributes and characteristics by which he led his life before January 6th, and which he has since then. Hunter will never downplay or try to reframe that day as solely a peaceful protest, although he carried no weapons, and never physically or verbally threatened or assaulted any law enforcement officers or other individuals.

At sentencing, Hunter respectfully asks this Court to grant his request for a departure or variance below the guidelines and impose a non-custodial sentence, comprising of 3 years of probation, with conditions to include 4 months of in-home detention, and 100 hours of community service. Such a sentence is sufficient, but no more than necessary, to meet the goals of sentencing after consideration of 18 U.S.C. § 3553(a) factors.

## II.   Guidelines Calculations & Objections

### A. Guidelines Calculations

The Probation Office calculated Hunter's Total Offense Level as 25 (¶ 49), consisting of a base offense of 14 points (PSR ¶ 40), plus 8 and 3-point adjustments (PSR,¶¶ 41 & 42) under USSG §§ 2J1.2(b)(1)(B) and 2J1.2(b)(2). The PSR states that these adjustments are warranted because (1) "the offense involved causing or threatening physical injury to a person, or property damage, in order to obstruct justice (to wit: Officer Goodman was confronted with multiple rioters, including the defendant.... [   ] Hunter Seefried stood with the mob of rioters as the mob shouted threatening statements at Officer Goodman while

2

continuing to advance toward him;" (PSR, ¶41) and "the offense resulted in substantial interference with the administration of justice…" (PSR, ¶ 42).

The Probation Office, however, recognizes that grounds exist for a variance. "As a result of the presentence investigation, the Probation Office has identified that the following factors that may warrant a variance from the applicable guideline range: defendant's youth and the total offense level may over-represent the seriousness of his conduct." PSR, ¶ 132.

B. Objections

The defense objects to the 8 and 3-point upward adjustments under USSG § 2J1.2(a) (PSR,¶ 41), USSG § 2J1.2(b)(1)(2) (PSR, ¶ 42).

Section 2J1.2(a) sets a base offense level for obstruction of justice at 14. The section further reads in pertinent part as follows:

> (b) Specific Offense Characteristics
> (1) (Apply the greatest):
> (B) If the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice, increase by 8 levels.
> (2) If the offense resulted in substantial interference with the administration of justice, increase by 3 levels.

It is clear, therefore, that for the 8-level enhancement to apply, the defendant must have caused or threatened to cause physical injury to another in order to obstruct the "administration of justice" for the 3-level enhancement to apply. Not only must the offense result in substantial interference, but the interference must be with the "administration of justice." It is apparent that a conviction under 18 U.S.C §1512(c)(2) has nothing whatsoever to do with the "administration of justice," a requirement for §§2J1.2(b)(1)(B) and 2J1.2(b)(2) to apply. Section §1512(c) deals with the obstruction of an

"official proceeding." A review of the history of the charge reveals that the provision was added to the statute in 2002 as part of the Sarbanes-Oxley Act. In 1995, the Supreme Court, in *United States v. Aguilar*, 515 U.S. 593 (1995), construed obstruction of the "due administration of justice" in 18 U.S.C. §1503 to require a showing that a defendant's actions must have the "natural and probable effect" of interfering with the due administration of justice. *Aguilar* at 599 (*citing United States v. Wood*, 6 F.3d 692,695 (10th Cir. 1993)). The Court went on to state that, "The action taken by the accused must be with the intent to influence judicial or grand jury proceedings." *Id.*

Similarly, courts have held that to convict a defendant under §1503, the government must establish, "(1) that there is a pending judicial or grand jury proceeding constituting the administration of justice, (2) that the defendant knew or had notice of the proceeding, and (3) that the defendant acted with the wrongful intent or improper purpose to influence the judicial or grand jury proceeding . . . that is, that the defendant corruptly intended to impede the administration of that judicial proceeding." *United States v. Sampson*, 898 F.3d 287, 299 (2nd Cir. 2018), (*quoting United States v. Schwarz*, 283 F.3d 76, 109 (2d Cir 2020)). It cannot be the case that the phrase "administration of justice" was intended to mean one thing in the criminal statutes such as § 1503 and something completely different in the Guidelines without a clear indication that such was intended to be the case. No such indication exists.

Therefore, it follows that "administration of justice" as used in §§ 2J1.2(b)(l)(B) and 2J1.2(b)(2) must involve a connection with a judicial or grand jury proceeding. Again, no such connection exists in the instant matter. In the Application Notes, it states, "Substantial interference with the administration of justice" includes a premature or

improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources. This definition pre-dates the 2002 amendment of §1512 which added an "official proceeding" to its scope. 18 U.S.C. § 1515(a)(l) expressly defines an "official proceeding" for purposes of §§ 1512 and 1513 to include judicial and legislative proceedings. As such, it is clear that the term "official proceeding" is a far broader term than "administration of justice." But the enhancements in § 2J1.2 require an obstruction of, or interference, with "the administration of justice" to apply, not an "official proceeding."

The enhancements in §2J1.2 originated before the "official proceeding" provision was added to §1512 in 2002, and no changes were made to the enhancements in 2002. The enhancements continued to only apply to interference with the "administration of justice." § 2J1.2 was amended twice in 2003 in response to the Sarbanes-Oxley Act but neither amendment addressed the issue presented here. Amendments 647 and 653 changed § 2J1.2 by increasing the base offense level and adding another enhancement that deals with document destruction. There is no claim here involving document destruction. They also added an upward departure provision concerning some obstructive conduct. As such, it is clear that the two enhancements in § 2J1.2 were never amended to encompass the broader concept of an "official proceeding" enacted in §1512(c) by the Sarbanes-Oxley Act. As obstruction of an "official proceeding" rather than the "administration of justice" is the theory of prosecution in this and the other January 6 cases, the enhancements do not apply.

Every circuit that has addressed issues involving the "administration of justice" has defined the term to apply to a judicial proceeding. In *United States v. Richardson,* 676 F.3d

491 (5th Cir. 2012), the court made this abundantly clear, stating, "We have defined "due administration of justice" as "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving truthful testimony when subpoenaed. Thus, obstructing **the due administration of justice means "interfering with the procedure of a judicial hearing or a trial."** *Richardson* at 502-503 (emphasis added) (citations omitted).

Other circuits have followed suit. In *United States v. Brenson*, 104 F.3d 1267 (11th Cir. 1997), the court stated that, "... due administration of justice" means "judicial procedure" and "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving thoughtful: testimony when subpoenaed." *Id.* at 1279-80. In *United States v. Warlick*, 742 F.2d 113, (4th Cir. 1984), the Fourth Circuit defined obstruction of the administration of justice as acts that "thwart the judicial process." *Id.* at 114. In *United States v. Rasheed*, 663 F.2d 843 (9th Cir. 1981), the Ninth Circuit stated that the administration of justice commences with "a specific judicial proceeding." *Id.* at 851.

Indeed, this Court, in *United States v. Hale-Cusanelli*, 21 Cr. 37 (TNM), declined to apply either enhancement on the grounds that, in obstructing the certification of the electoral college vote count, the defendant was not obstructing or interfering with the administration of justice. This Court, therefore, should rule similarly here.

C. <u>Four Level Minor Role Downward Adjustment under § 3B1.2</u>

Hunter requested that the Probation Office make a downward adjustment of four-levels to the Total Offense based upon his minor role in the offense under USSG § 3B1.2. The reduction is warranted under the circumstances of this case. Hunter's actions and criminal behavior are significantly less culpable than others, including his father, charged in the

January 6th riot in the Capitol and with whom he was convicted, *inter alia*, of obstructing justice and aiding and abetting.

In *United States v. Soto*, 132 F.3d 56 (D.C. Cir. 1997), the Circuit Court explained the premise behind the § 3B1.2 Mitigating Role Adjustment. The Court wrote:

> Recognizing that not all offenders are equally culpable, the Sentencing Guidelines authorize reduced sentences for defendants whose participation in illegal conduct was minor, minimal, or somewhere in between. Section 3B1.2 instructs:
>
> Based on the defendant's role in the offense, decrease the offense level as follows:
>
> (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
>
> (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels. In cases falling between (a) and (b), decrease by 3 levels.

*Id.* at 57. "[S]uch adjustments are proper only when the defendant is 'plainly among the least culpable' or 'less culpable than most other participants.'" *United States v. Mellen*, 393 F.3d 175, 187 (D.C. Cir. 2004) (citation omitted). Further, in determining whether a defendant qualifies for an adjustment under § 3B1.2, the sentencing court must make a comparative analysis of the defendant's role with others involved in the criminality. "[W]e read § 3B1.2 as instructing courts to look beyond the individuals brought before it to the overall criminal scheme when determining whether a particular defendant is a minor participant in the criminal scheme." *United States v. Rojas-Millan*, 234 F.3d 464, 473 (9th Cir. 2000). "When measuring a defendant's culpability relative to that of other participants, district courts must compare the defendant's involvement to that of all likely participants in the criminal scheme for whom there is sufficient evidence of their existence and participation." *United States v. Diaz*, 884 F.3d 911, 916 (9th Cir. 2018).

The determination of whether a defendant was a minor participant "is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the

particular case." USSG §3B1.2, comment n.3(C). To make this determination, a court should consider the degree to which the defendant (1) understood the scope and structure of the criminal activity, (2) planned or organized the criminal activity, (3) held a decision-making role, (4) participated and possessed discretion and responsibility, and (5) stood to benefit from the criminal activity. *Id.* However, " [a] defendant must prove by a preponderance of the evidence that she is entitled to a minor role adjustment under § 3B1.2 of the Sentencing Guidelines," *U.S. v. Castano*, 234 F.3d 111, 113 (2d Cir. 2000) (citation omitted)).

A four-level downward adjustment is appropriate here because, as compared to other defendants involved in the January 6th riot, Hunter was among the least culpable. The government charged over 800 individuals with offenses stemming from the riot on January 6, 2021. Several defendants, weeks before converging on the Capitol, plotted and conspired to engage in seditious behavior. Others encouraged individuals to bring guns and other weapons to D.C. and advocated violence and the harming of legislators. Many followed through and came armed with semi-automatic rifles and handguns and numerous rounds of ammunition, yet others verbally and physically assaulted law enforcement officers using bear spray, bike racks, fire extinguishers, batons and shields taken from police officers. Many illegally entered the Capitol Building and occupied the Senate Chamber posing for photos from the dais or inside legislators' offices. Some entered the Speaker of the House Chambers and rifled through confidential documents and stole items as souvenirs. Many subsequently bragged, through various media postings on Twitter, Facebook, Instagram, and other social platforms, about what they did in the Capitol. Hunter did none of those things.

While Hunter was among the first group to enter the Capitol Building, his actions leading up to attending the rally in D.C., and his involvement in entering and remaining in the Capitol

Building supports a minimal role downward adjustment under § 3B1.2(a). Undoubtedly, Hunter joined in with the crowds going to the Capitol Building. He scaled a wall to reach the building and he removed a small chard of glass, to enter the building without cutting himself, from a window that others had already busted out. But Hunter did not engage in the more egregious types of behavior and did not do most of the things that other defendants did either leading up to January 6th, or on the day itself. Specifically, Hunter :

- Did not plot or plan with anyone or entity to engage in violence or to bring weapons to the Capitol;
- Was not a member of, or involved with, any right-wing militia or hate groups, nor did he correspond with any;
- Did not use social media before attending the rally, promoting or encouraging violent behavior rally on January 6, 2021;
- Did not take any weapons to the Capitol;
- Did not carry anything that could be used as a weapon on his person, or in his hands as he approached, entered, and/or went through the Capitol Building;
- Did not verbally or physically threaten or assault any law enforcement or other individuals he encountered;
- Did not enter any offices or private chambers in the Capitol Building; and
- Did not search, rummage through, or remove/steal documents or other things from inside the Capitol Building.

Comparatively speaking, therefore, Hunter qualifies for and should receive a four-level adjustment under § 3B1.2(a) because his involvement in the riot was minimal compared to the actions of other riot participants. Based upon the totality of the circumstances and the facts particular to the events of January 6th, therefore, Hunter qualifies for a minimal role adjustment. The factors listed in Application Note 3(c) to § 3B1.2 also weigh in his favor. He lacked any understanding of the scope and structure of the criminal activity; did not participate in planning or organizing the criminal activity or know about a plan for violent behavior on January 6th and did not stand to benefit from his criminal behavior. Rather, Hunter got caught up in the momentum of the crowds and engaged

in spontaneous and impulsive behavior. The nature and extent of his participation was limited, thereby justifying a reduction. *See United States v. Restrepo*, 936 F.2d 661 (2d Cir. 1991) (based on minimal role in a money laundering offense – merely unloading boxes of money in a warehouse on one date – defendant received both a four-level offense level reduction and a four-level downward departure); *United States v. Garrison*, 560 F.Supp.2d 83 (D. Mass. 2008) (the court compares other defendants' involvement in the same drug enforcement sweep before imposing a 30-month sentence, rather than a 77-96 month guideline term, noting that charging Garrison separately obscured his very minor role in any larger distribution ring and made it difficult for the court to take that into account); *United States v. Davis*, 2008 WL 2329290 (S.D.N.Y. June 5, 2008) (time served imposed for a first-time offender whose possession of sawed-off shotgun prompted by economic pressures, was minor in comparison to co-actor who engaged in a number of firearm sales); *United States v. Greer*, 375 F.Supp.2d 790 (E.D. Wisc. 2005) (in a drug case, guideline range of 46-48 months was "greater than necessary to satisfy the purposes of sentencing [and] no period of imprisonment was appropriate" in part because of the girlfriend's peripheral role.)

## III.   Procedural History & Factual Background

### A.   Procedural History

Hunter comes before the Court on October 24, 2022, for sentencing after being convicted in a non-jury trial by this Court of Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) and 2 (Count 1); Entering and Remaining in a Restricted Building or Grounds, in violation 18 U.S.C. §1752(a)(1) (Count 2); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count 3); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G)

(Count 4); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 5).

B. Factual Background

On January 6, 2021, Hunter, his mother, and his girlfriend, traveled with his father, Co-defendant Kevin Seefried, to Washington, D.C., at the insistence of his father. Hunter took a small Trump flag, while his father took a large confederate flag on the trip. All four travelers went to the Ellipse and listened to speeches by President Trump and other prominent supporters of the former president. The speakers addressed the large crowds with rhetoric of election fraud and the need to protect the country from President-Elect Biden and his party who "stole the presidential election." The speeches continued the false narrative of election fraud that Trump and others had been drumming into the heads and minds of his supporter from early 2020, and which false claims had become more pervasive once President Biden was declared winner of the election.

On January 6, 2021, shortly before crowds of his supporters stormed the Capitol, Trump, like the other speakers, delivered a fiery speech at the rally in the Ellipse:

> We beat them four years ago. We surprised them. We took them by surprise and this year they rigged an election. **They rigged it like they've never rigged an election before.** And by the way, last night they didn't do a bad job either if you notice....
>
> **All of us here today do not want to see our election victory stolen by emboldened radical-left Democrats, which is what they're doing. And stolen by the fake news media.** That's what they've done and what they're doing. **We will never give up, we will never concede. It doesn't happen. You don't concede when there's theft involved.**
>
> **Our country has had enough**. **We will not take it anymore and that's what this is all about**. And to use a favorite term that all of you people really came up with: **We will stop the steal**. Today I will lay out just some of the evidence proving that we won this election and we won it by a landslide. This was not a close election....

… **We didn't lose.**

It's a disgrace. There's never been anything like that. **You could take third-world countries.** Just take a look. Take third-world countries. **Their elections are more honest than what we've been going through in this country. It's a disgrace. It's a disgrace.**

We're gathered together in the heart of our nation's Capital for one very, very basic and simple reason: To save our democracy.

For years, **Democrats have gotten away with election fraud and weak Republicans.** And that's what they are. There's so many weak Republicans. And we have great ones. **Jim Jordan and some of these guys, they're out there fighting. The House guys are fighting. But it's, it's incredible.**

Many of the Republicans, I helped them get in, I helped them get elected. I helped Mitch get elected. I helped. I could name 24 of them, let's say….

They're weak Republicans, they're pathetic Republicans and that's what happens.

If this happened to the Democrats, there'd be hell all over the country going on. There'd be hell all over the country….

So when you hear, **when you hear, while there is no evidence to prove any wrongdoing, this is the most fraudulent thing anybody has, this is a criminal enterprise. This is a criminal enterprise….**

I could go on for another hour reading this stuff to you and telling you about it. There's never been anything like it….

**Looking out at all the amazing patriots here today, I have never been more confident in our nation's future….**

**If we allow this group of people to illegally take over our country because it's illegal when the votes are illegal when the way they got there is illegal when the states that vote are given false and fraudulent information….**

…I think Biden's getting in, the caravans are forming again. They want to come in again and rip off our country. Can't let it happen.

As this enormous crowd shows, we have truth and justice on our side. We have a deep and enduring love for America in our hearts. We love our country….

> Together, we are determined to defend and preserve government of the people, by the people and for the people....

Former President Trump's Speech of January 6, 2021, AP News, January 13, 2021, *Transcript of Trump's Speech at Rally Before US Capitol Riot*, https://apnews.com/article/election-2020-joe-biden-donald-trump-capitol-siege-media-e79eb5164613d6718e9f4502eb471f27.    (Emphasis added.) Trump ended his speech with a call to arms, directing the crowd of supporters to go to the Capitol to stop the fraud and to "**fight like hell**," stating:

> **And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore.**
>
> **Our exciting adventures and boldest endeavors have not yet begun.** My fellow Americans, for our movement, for our children, and for our beloved country.
>
> **So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania Avenue. And we're going to the Capitol, and we're going to try and give.**
>
> **We're going to try and give them the kind of pride and boldness that they need to take back our country.**
>
> **So let's walk down Pennsylvania Avenue.**

*Id.* (Emphasis added).

After listening to the former president's speech, Hunter and his family ate lunch at their vehicle, planning to return home to Delaware when finished. However, that plan changed when Hunter's father decided that the family should join the crowds of people walking toward the Capitol. So, Hunter followed his father, with his mother and girlfriend in tow. Hunter and his father got separated in the crowd from the women and each other in the throngs of people. Upon reaching the Capitol building, Hunter entered through an already broken window after removing a chard of glass to avoid being injured. He was among the first individuals to enter the building about 2:15 pm. Hunter was not armed with any object or weapons, and he did not carry anything

that could be perceived as a weapon or as threatening to anyone. Hunter and his father entered the building separately, and he followed a group who was trailing Officer Goodman upstairs and eventually to the Ohio Clock Corridor area.

Hunter was inside the Capitol for the approximately 20-odd minutes. During that time, he did not verbally nor physically threaten any law enforcement officers; did not break into any offices or chambers; did not rifle through any documents or papers; and surely didn't remove any property from the building.

Within days of learning that he and his father were wanted by the FBI, Hunter, led by his father, traveled to Maryland and voluntarily submitted to an interview with the FBI regarding the trip to Washington, DC on January 6th and his actions going into the Capitol Building. While Hunter was forthcoming regarding the events of the trip to the Capitol and admitted being inside the Capitol building without permission, he was slow to admit that he saw the breaking of the window through which he entered the building, or that he removed a chard of glass to safely enter. Upon request, Hunter also immediately surrendered his phone to the FBI agent and gave the FBI permission to search his phone and its content. After his interview, Hunter was permitted to home in Delaware; where he stayed until being notified that a complaint and warrant had been issued for him.

Hunter surrendered to the Marshal in Wilmington and was arraigned in the District of Delaware. He was released on his own recognizance pending his appearance in this District, where he was continued on pretrial release pending the disposition of this matter. Ever since, Hunter has been in full compliance with the conditions of release set by this Court.

C. Personal History and Characteristics

On January 6, 2021, Hunter had just turned 21 years old. He was born on November 11, 1997, to the marital union of Stephanie and Kevin Seefried, his co-defendant in the instant case. Hunter has two older half-siblings, Kevin, Jr. (age 36) and Elysia (age 29), who grew up in his parents' home in Laurel, Delaware. His older siblings both left home at an early age due to conflicts with their father. When his siblings lived at home, Hunter saw much bickering and arguments between them and his father. They would often question their father's positions on various matters, leading to frequent arguments and hostility among them that disrupted the entire household. As such, Hunter determined as a child that "it was better to go along with what Dad wanted than to hear him going on until he got what he wanted." Kevin, Jr. describes his father as highly opinionated and an individual who forces his ideology on others. Exhibit A, p. 7.

Hunter dropped out of school in ninth grade with the assistance of his father, without his mother's knowledge or approval. He was around 15 years old. See Exhibit A, p.1, Stephanie Seefried's Letter. Hunter immediately started working a full-time job at Poultry Litter Treatment (PLT) in Laurel, Delaware, the day after he left school. He later got a job with Eastern Forklift, which supplies forklifts and repairs other related, commercial heavy equipment. Hunter started as a "yard person" and was promoted to a shop technician. According to Hunter, he intended to make a career at Eastern Forklift and was training to become a technical field repairman for the company. However, he was terminated due to his participation in the riot on January 6th. Notwithstanding, Hunter soon found another job at Superior Dry Wall, where he worked prior to his employment with Eastern Forklift. Hunter has been with Superior Dry Wall for about two years.

15

In addition to working full-time, Hunter runs a side business detailing cars, cutting grass, and doing odd landscaping-type jobs for people in his community in Laurel. Both at his full-time job and his side business, everyone with whom he has contact describes him as a hard and conscientious worker who takes pride in his work. Those who personally know Hunter describe him as "honest," "quiet and reserved," "kind," "helpful," "having a good heart," "thoughtful," "compassionate," "empathetic," and "loving. *See* Exhibit A.

## IV.   DISCUSSION

This Court should grant a variance from the sentencing guidelines and impose a sentence below the guidelines and impose a non-custodial sentence, comprising of no more than 3 years of probation, with conditions to include 4 months of in-home detention, and 100 hours of community service. A downward variance is warranted based upon all the reasons set forth herein, as well as the factors set forth in USSG § 3353(a).

A. <u>Sentencing Considerations Which Call for a Downward Variance to Accomplish the Purposes Set Forth in 18 U.S.C. 3553(a)(2).</u>

In *United States v. Booker*, the Supreme Court held that the United States Sentencing Guidelines are no longer binding on district courts, but rather are advisory only. *United States v. Booker* 543 U.S. 220, 245, (2005); *see Peugh v. United States,* —— U.S. ——, 133 S.Ct. 2072, 2079–80 (2013). After *Booker*, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall, supra* at (2007). But the court must then consider the arguments of the parties and the seven sentencing factors outlined in 18 U.S.C. § 3553(a) 18 U.S.C. § 3553(a) to determine the appropriate sentence, including whether a variance from the advisory Guidelines range is warranted. *Id.* at 49–50; *United States v. Williams*, 773 F.3d 98, 107-08 (D.C. Cir. 2014). Once the Court has properly calculated the advisory range under the Sentencing Guidelines, the Court

is ultimately tasked to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" listed in 18 U.S.C. § 3553(a)(2). Thus, the Guidelines are just "the starting point" for the Court to consider, along with all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49 (2007). Since the Guidelines are a "starting point," the Court "may not presume that the Guidelines range is reasonable. [Rather, the Court] must make an individualized assessment based on the facts presented." *Id.* at 50. *See also Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The guidelines are not only not mandatory, on sentencing courts; they are also not to be presumed reasonable."). *See, e.g., United States v. Baker*, 655 F.3d 677, 683 n. 1 (7th Cir. 2011) (stating that the sentencing court is to impose "a minimally sufficient sentence"); *United States v. Rodriquez*, 527 F.3d 221, 228 (1st Cir. 2008) (explaining that a district court evaluating a variant sentence request should consider all relevant § 3553(a) factors as a group and strive to construct a sentence that is minimally sufficient to achieve the broad goals of sentencing"). Thus, a below guidelines sentence does not have to be justified by "extraordinary" circumstances and is not governed by any "rigid mathematical formula." *Gall*, 552 U.S. at 47.

This Court should grant Hunter a variance, upon the grounds set forth below, and impose a non-custodial sentence below the guidelines range. It should be noted that Hunter is extremely remorseful and fully accepts responsibility for his behavior and actions in joining in with the crowds that entered the Capitol Building. Nonetheless, three factors primarily led to his engaging in the behavior and actions presented at trial: (1) the fiery speeches by the former President and his prominent and well-known allies, (2) his lack of maturity and impulsivity stemming from his tender age, and (3) succumbing to the strong influence of his father for them to participate with the crowd, as well as his father's failure to provide appropriate guidance at crucial times during January 6th.

B.  Impact of Months of False Claims of a Stolen Election and the Speeches of Trump and his Prominent and Well-Known Supporters at the Ellipse Contributed to Hunter's Conduct on January 6th

Hunter was not into politics like his father was.  In fact, 2021 was the first time that he could vote in a presidential election.  His parents are Republicans and supported Trump, so Hunter also intended to, and did, in fact, also vote Republican and for Trump as president.  For almost a full year before the 2020 presidential election, Trump and many of his prominent and nationally known supporters, including "America's Mayor" Rudy Giuliani, flooded the airways with the claims that "if Trump lost the election it would be because of massive election fraud." See, Inskeep, S., *Timeline: What Trump Told Supporters For Months Before They Attacked*, NPR, February 8, 2021, available at https://www.npr.org/2021/02/08/965342252/timeline-what-trump-told-supporters-for-months-before-they-attacked.  After the presidential election was called for Joe Biden, Trump and his allies increased the rhetoric, spreading the false narrative that the election was stolen.  Several Senators and Congresspersons actively joined the Trump bandwagon, denying that Biden had won and spreading propaganda and a false narrative of massive election fraud, and pushing the "Stop the Steal" moniker. See, Soyoung Kim, Brian Thevenot and Jon McClure, *The Republicans who voted to overturn the election*, Reuters Graphis, February 4, 2021, available at: https://graphics.reuters.com/USA-TRUMP/LAWMAKERS/xegpbedzdvq/.  Included in this group were Senators Ted Cruz and Josh Hawley, and Representatives Paul Gosar, Marjorie Taylor Green, Louie Gohmert, and Ronny Jackson.  Ted Cruz, along with several other senators, released a statement on January 2, 2021, stating:

> Voter fraud has posed a persistent challenge in our elections, although its breadth and scope are disputed. **By any measure, the allegations of fraud and irregularities in the 2020 election exceed any in our lifetimes**…

18

**And those allegations are not believed just by one individual candidate. Instead, they are widespread**…. Congress should immediately appoint an Electoral Commission, with full investigatory and fact-finding authority, to conduct an emergency 10-day audit of the election returns in the disputed states. Once completed, individual states would evaluate the Commission's findings and could convene a special legislative session to certify a change in their vote, if needed.

Accordingly, we intend to vote on January 6 to reject the electors from disputed states as not 'regularly given' and 'lawfully certified' (the statutory requisite), unless and until that emergency 10-day audit is completed.

https://www.cruz.senate.gov/newsroom/press-releases/joint-statement-from-senators-cruz-johnson-lankford-daines-kennedy-blackburn-braun-senators-elect-lummis-marshall-hagerty-tuberville. Senator Hawley, about ninety minutes before the crowds began their march on the Capitol Building, raised his fist to the crowds, in what many believed further incentivized and encouraged the crowds who rioted. See Photo *shows Hawley giving fist pump to Trump supporters before Capitol violence,*

*https://www.youtube.com/watch?v=MTEn075r_aI&ab_channel=KSDKNews.*

Social media platforms were inundated with postings and tweets promoting the false claims of election fraud and the need for citizens to "stop the steal" leading up to January 6, 2021. See, *#StopTheSteal: Timeline of Social Media and Extremist Activities Leading to 1/6 Insurrection*[1], Atlantic Council's DFRLab. These false narratives from Trump and others were so pervasive and effective, that over a year later, most Republican voters still believe that the election was stolen. See, John Greenberg, February 14, 2022, *Most Republicans still falsely believe Trump's stolen election claims*, PolitiFact's, available at:  https://www.politifact.com/article/2022/jun/14/most-

---

[1] Written by Jared Holt (@jaredlholt) and edited by Andy Carvin (@acarvin), Graham Brookie (@GrahamBrookie), Zarine Kharazian (@zkharazian), and Emerson T. Brooking (@etbrooking). Additional research by Jacqueline Malaret (@jacqumalaret), Alyssa Kann (@AlyssaKann), Max Rizzuto (@maxbrizzuto) and Jean Le Roux (@jean_leroux).

republicans-falsely-believe-trumps-stolen-ele/. See also, John L. Dorman, *WATCH: GOP Rep. Mo Brooks erupts after Fox News host pushes back against unfounded 2020 voter fraud claims*, The Insider, May 29, 2022, available at https://www.businessinsider.com/mo-brooks-fox-news-2020-election-fraud-exchange-2022-5.

The pervasiveness and sustained "Stop the Steal" propaganda, combined with the incendiary remarks by speakers at the Ellipse, lit the fuse of the crowds on January 6, 2021, and led them to storm the Capitol Building. Hunter, a young adult of 21, was mesmerized by these false claims that the election was stolen and that common citizens had to save American democracy by ensuring Trump maintained the presidency. This young man, like so many, was not immune from these false and propagandistic claims. Moreover, these claims were reinforced by Hunter's father's strong belief and acceptance of them. Coupled with the momentum of the crowd, Hunter impulsively engaged in the conduct that led to his conviction.

Hunter does not raise this – the pervasive and influential weight of the "Big Lie" by prominent and well-respected individuals - to excuse his behavior, but only to highlight the impact their lies had on him in context with the non-criminal life he led before January 6, 2021.

C.  Youthfulness and Incomplete Development of a Mature Brain

The Probation Office identifies Hunter's youth as one of two factors that may warrant a variance below the applicable guideline range. (PSR 132). Although Hunter was 21 years old at the time of the riot – legally an adult with the right to vote – he qualifies as a youthful offender and should be given consideration as such for purposes of sentencing by this Court.

In recognition of the neuroscience of brain development, the United States Sentencing Commission (the Commission) in 2017, expanded its definition of "youthful offenders" to include "persons aged 25 or younger at the time they are sentenced in the federal system."

*Youthful Offenders in the Federal System, Fiscal Years 2010 to 2017*, May 2017, p1,

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

publications/2017/20170525_youthful-offenders.pdf.   In   reaching   these   decisions,   the

Commission recognized  recent studies on brain development and age, and Supreme Court

decisions noting  differences in offender culpability due to age, have led some policymakers

to reconsider how youthful offenders should be punished. *Id.,* pp.1 and 7.  In particular, the

Commission acknowledges that:

> First, researchers agree that the prefrontal cortex is not complete by the age
> of 18, which is the legal age of majority in most state jurisdictions and in the
> federal system. Second, researchers agree that development continues into
> the 20s. Third, most researchers reference 25 as the average age at which full
> development has taken place but note there will be significant variation from
> person to person.

*Id.* at 7 (citations omitted).  See also, *Maturation of the Adolescent Brain, M. Arain et al.*, found

at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3621648/. *See also* Tirza A. Mullin, *Eighteen*

*Is Not A Magic Number: Why the Eighth Amendment Requires Protection for Youth Aged Eighteen*

*to Twenty-Five*, 53 U. Mich. J.L. Reform 807, 812 (2020) ("The prefrontal cortex is essential for

both impulse control and decision-making in complex or high-stress situations and '[t]he fact

remains that young people between the ages of eighteen and twenty-five do not have fully-

developed capacity to control impulses and make rational choices.'" (quoting David Pimentel, *The*

*Widening Maturity Gap: Trying and Punishing Juveniles As Adults in an Era of Extended*

*Adolescence*, 46 Tex. Tech. L. Rev. 71, 84 (2013)).  The brain science supports Hunter's request

for a downward variance based upon his youth at the time of the offense and incomplete brain

development.

### D. No Help from His Father in Controlling His Impulsive Behavior

No question, Hunter handled himself poorly and engaged in bad and criminal behavior on January 6, 2021. He, however, acted impulsively and was swayed greatly by crowd dynamics. But Hunter was only 21 years old, and the parent who led him to attend the rally on January 6th and, subsequently, to join in the demonstration of the mob-like crowds failed to set the example that would have prevented both their involvement with the angry crowds marching to the Capitol. Instead of staying with the plan to head home after lunch, Kevin Seefried insisted that Hunter, his mother, and his girlfriend join the agitated crowds. Intuitively, children look to their parents, and young men look particularly to their fathers, to guide them and to dissuade them from engaging in impulsive behavior and stupid behavior. By his actions and statements on January 6, Kevin Seefried set the wrong example for his child. Notwithstanding, Hunter showed restraint and did not engage in the type of behavior that law enforcement witnesses testified that Kevin Seefried engaged in once inside the Capitol Building.

Leading up to the election, Hunter's father paid close attention to all the right-wing news channels and accepted the claims that there was massive fraud in the presidential election and that the presidency was being stolen from Trump. Kevin Seefried adopted the claims that the election was stolen from Trump and was always espousing these opinions to Hunter and the rest of his family.

Hunter voted for Trump, and he was disappointed that he lost. Based upon the unrelenting deluge of media statements of Trump and his supporters that the election was stolen from him, which was reinforced by his father's insistence that Trump was cheated, Hunter accepted the "Big Lie." However, he had no intent or desire to go to Washington, D.C. to protest Trump's electoral loss. When his father heeded the former president's demand

for his supporters to attend a rally on January 6th at the Ellipse in Washington, D.C., and requested that his entire household attend the rally with him, Hunter felt constrained to go, although he lacked any desire to. According to Hunter, his mother, and his then-live-in girlfriend, it was easier to go along with his father's demand than to hear him the constant bickering about their need to go to D.C. and support the former president. Given that Hunter went to D.C. and joined the crowd storming and entering the Capitol under the influence and insistence of his father, the Court should consider a downward variance on this basis as well.

    E.  <u>Aberrant Behavior Variance</u>

The aberrant nature of Hunter's actions on January 6, 2021, also allows for a variance below the guidelines. He was barely 21 years old at the time that he participated in the rioting that occurred on January 6th and engaged in the behavior lad led to his conviction. However, before that day, Hunter led a law-abiding life, and by all accounts, was extremely loving, caring, responsible and hard-working. *See* Exhibit A. His relationship and assistance to his brother Kevin, Jr., and his nieces stand as a clear example of his loving and caring nature. "I have struggled with addiction throughout the past 10 years which has sometimes put strain and distance in our relationship. But even still my brother never gave up on me never stopped loving me and was there for me whenever I was in need. He's helped look after my daughters when I wasn't fit to be in their lives. He's forgiven and helped me in forgive myself so I can move on to a new chapter in my life." Exhibit A at 7. Hunter has been gainfully employed on a full-time basis, since leaving school in 9th grade. Unlike many high school dropouts, he did not sit around wasting time or engage in delinquent or destructive behavior. Neither did he dally in the drug culture or abuse alcohol, another frequent pitfall of many who leave school early. Instead, Hunter started working

at Poultry Litter Treatment (PLT) in Laurel, Delaware, the day after he left school in 2013[2]. His job at PLT was dirty and menial, requiring him to enter commercial chicken coops to spread a chemical litter on chicken waste at various locations throughout Delaware. He would return home every day smelling of chicken feces. But he stayed the course for about one and a half years before taking a job with Mike's Clearance Center around early 2015 until 2017. In 2017, he worked at Creanfield Construction in Laurel, Maryland for about 9 month before getting a better job working at Superior Drywall with his father, where he worked for until he secured employment with Eastern Lift Truck around December 2018. Hunter really enjoyed working at Eastern Lift Truck and was soon promoted. He worked there until he was fired after photos of him were shown on television depicting him entering and walking around the Capitol Building.[3] But, Hunter was soon rehired at his former job with Superior Drywall. Hunter continues to work there, and his boss speaks highly of him, stating that "He's an honest hard working young man and here he has shown good character and a strong work ethic." See Exhibit A, p. 3. In addition to working a fulltime job, Hunter saved some money for a down payment for the purchase of a riding mower and landscaping equipment and started a side business doing landscaping work on evenings and weekends.

Prior to this incident, Hunter has never had contact with the criminal justice system, not even as a juvenile. Thus, he has zero criminal history points and falls in Criminal History Category I. Everyone who knows Hunter was shocked to learn that he got caught up in the events in the Capitol on January 6, 2021, because it is so much unlike the person they have known for years. Friends, acquaintances, former and current co-workers, landscaping clients, and family alike, all

---

[2] The PSR incorrectly states that Hunter started work PLT from April 2015 to December 2017, and also misstates the sequence of his employment history. See, PSR, ¶¶ 78-80.

[3] The stigma from his behavior and the infamy from be shown hundreds of times on national television entering and walking around engaging in criminal behavior in the Capitol is something that Hunter carries every day and is something that he knows will impact him forever.

generally describes Hunter as "quiet and reserved," "thoughtful," "honest," "hardworking," "helpful," "kind," "empathetic," "loving," and "having a good heart." A person for whom such behavior was unprecedented, unexpected and aberrant. See Exhibit A. They all tend to agree that Hunter will never be involved in such behavior or any other criminality in the future.

There is no doubt that the false messaging and propaganda of fraud in the presidential election, the demands for his supporters to "Stop the Steal" and the fiery messaging in speeches on January 6th, as well as the influence of his father's proselytizing and directing that the family go with him to the rally and later join the burgeoning crowd going to the Capitol Building, played a part in Hunter's actions that day. Hunter got caught up in the dynamics of the crowd, and without time to think about what he was doing and the consequences, behaved badly and criminally. There was no time for reflection, as the momentum and adrenaline of the crowd overrode his usually good common sense and morals that he had displayed for all of his life save for January 6, 2021.

His actions were not planned or thought out. Left to his own devices, Hunter would not have been in Washington that day. Instead, he went to appease his father, like the rest of the household. He regrets his behavior and is well back on the path and manner in which he lived his life before that ill-fated day.

This Court is not bound by the more rigorous requirements for Aberrant Behavior departures under USSG 5K.2.20, although Hunter most likely meets that standard. In *United States v. Tom*, 327 Fed. App'x 93 (10th Cir. 2009), the Tenth Circuit, in a case of second-degree murder, affirmed a district court's below-guideline sentence based in part on the "aberrational nature of the offense." *Id.* at 97. The court rejected the government's argument that the district court's reliance on this factor (and some others) constituted reversible error because it is "in tension with certain policy

statements discouraging departures, and that these policy statements should have been considered under § 3553(a)(5)." *Id.* As the court stated, "[t]he simple answer to this contention is that the general policy statements apply to departures, but the district court has a freer hand when it comes to variances and may consider these factors as part of the nature and circumstances of the offense and the history and characteristics of the defendant in fashioning a reasonable sentence consistent with the overall objectives of § 3553(a)." *Id.* at 97-98. Therefore, this Court should find that Hunter also qualifies for downward variance on this basis.

      F.   The Total Offense Level Over-represents the Serious of Hunter's Conduct

As noted earlier, Hunter did not want to go to D.C. on January 6, 2021 and did not want to join in with the crowds marching on the Capitol Building. His will was overborne by his father in both instances. Hunter's lapse of judgment and resulting criminal conduct is contrary to how he has lived the first 21 years of his life. While he fell in with the crowd which followed Officer Goodman upstairs and into the Ohio Clock Corridor, he did not verbally or physically threaten or assault anyone, including Officer Goodman, on January 6, 2021. In fact, Officer Goodman, as well as Inspector Lloyd, testified that Hunter was not aggressive, or yelling. He "just remembered Hunter not leaving." Inspector Lloyd indicated that he was not concerned that Hunter was posing a specific threat like others but was concerned only because he was in an area where he should not have been[4]. He carried no weapons or had other paraphernalia which would indicates that he came to Washington expecting or looking to instigate violence. Neither was, or is, Hunter connected to any right-wing or militia groups. He had no presence on social media, before or after January 6th, advocating that the election was stolen or inciting others to go to Washington for illicit purposes. Nor did Hunter, after January 6th, make any statements indicating that his behavior was warranted

---

[4] Counsel does not have a transcript of the waiver trial and the testimony attributed to Office Goodman and Inspector Lloyd are taken from Counsel's trial notes.

or excusable, nor that he would engage in the same behavior in the future.  However, many others involved in riotous behavior on  January 6th, some of whom were charged with, or were offered and plead to lesser offenses, actual engaged in the types of behavior and conduct which Hunter avoided[5]. Rather, he is greatly remorseful and ashamed of his behavior that day. His criminal behavior did not include short-lived and spontaneous.  And the incident of January 6th represents the first time that he acted outside of the law and the first and only time he has ever been arrested as an adult or juvenile.

Hunter, moreover, deeply regrets his conduct on January 6th. To the extent his actions contributed to the distress of members of Congress, their staff, or outnumbered law enforcement

---

[5] *See e.g.*, *United States v. Cleveland Meredith*, 21-CR-00159-ABJ, (The defendant drove from Colorado to Washington, D.C., and while in route, and after arriving there on January 6, 2021,sent several text messages threatening to engage in violence in D.C. Defendant remained in D.C. on January 7, 2021, and sent a text message threatening to shoot Speaker of the House Nancy Pelosi. Defendant's mother contacted the FBI to warn of Defendant's threats and to prevent her son from harming himself and others. Defendant was arrested in a hotel in D.C. before he could carry out his threats. He had in his possession an assault-style rifle with a telescopic sight, a 9 mm semi-automatic firearm, over 2,500 rounds of ammunition, and multiple high-capacity magazines. Exhibit B, Government's Sentencing Memorandum, *Id.* at 2, 4-10, D.K. #54. Excerpts Exhibit B.

*United States v. Jenny Cudd*, 21-CR-00068-TNM, (The defendant Cudd pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1): Entering and Remaining in a Restricted Building or Grounds. As explained herein, a sentence of seventy-five days of incarceration is appropriate in this case because Cudd: (1) prepared for violence by wearing a bulletproof sweatshirt during the riot; (2) was undeterred by physical obstacles she encountered before entering the Capitol building—for instance, she crossed overturned bike racks and scaled a wall to get to the Capitol; (3) engaged in a self-described push against law enforcement officers before entering the Capitol building—for instance, she crossed overturned bike racks and scaled while yelling "go" and "charge" to reach the entrance of the U.S. Capitol building; (4) entered the U.S. Capitol building and remained inside for approximately 20 minutes, despite hearing loud banging and smelling—and feeling the effects of—tear gas; (5) after exiting the Capitol building, remained on Capitol grounds, watching clashes with law enforcement officers, for what appears to be about an hour and 20 minutes after exiting Capitol building; (6) celebrated property destruction after leaving the Capitol. For example, on social media, Cudd posted, "We didn't vandalize anything. But we did. We did, as I say that. We did break down the Nancy Pelosi's office door and somebody stole her gavel and took a picture sitting in the chair flipping off the camera;" and, finally, (7) lacks remorse for her participation in the events of January 6 and has noted that she may participate in similar events in the future. For instance, after the riot, Cudd posted about her lack of remorse to social media, including in a January 6, 2021, Facebook live video, in which she states, "I'm proud of everything that I was a part of today. And I'll be proud of everything that I'm a part of at the next one." In an interview on January 8, 2021, Cudd repeated this sentiment, stating, "**I would do it again in a heartbeat because I did not break any laws**. I went inside the Capitol completely legally, and I did not do anything to hurt anybody or destroy any property. So, yes, **I would absolutely do it again**." *Id.* at 1-5, 10-11 Dk. #90.

officers, he offers them his sincere apology to the entire country, the Congress, all law enforcement officers, the government, and this Court.  He will personally demonstrate remorse at sentencing in his allocution. A defendant's true remorse, whether exceptional or not, is a valid basis for a downward variance.  And district courts may vary downward based on remorse without regard to whether the acceptance of responsibility adjustment under U.S.S.G. §3E1.1 is applied.  See *United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008).

G. The Sentencing Factors under 18 USSG § 3553(a) Support a Sentence below the Guidelines.

Of the goals set out in 18 U.S.C. § 3553(a)(2), the Court must carefully consider the need for the sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrents to criminal conduct;" "to protect the public from further crimes of the defendant;" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" 18 U.S.C. § 3553(a)(2).  However, if the Court believes a sentence is "reasonable" given the nature and circumstances of the offense, the personal history and characteristics of the defendant, and the additional factors outlined in 18 U.S.C. § 3553(a), the sentence may be outside of the Guidelines range. *U.S. v. Watson*, 385 F. Supp. 2d 534, 537 (E.D. Pa. 2005), aff'd, 482 F.3d 269 (3d Cir. 2007).

Section 3553(a) requires courts to fashion a sentence in a way that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).  A sentence of no more than 3 years of probation with 4 months of in-home detention, coupled with 200 hours of community service would not create gross unwarranted sentence disparities.  As stated earlier, Hunter's conduct was nonviolent.  But consider the sentence imposed in *United States v. Mark Leffingwell*, 21-cr-5-ABJ (D.D.C. 2021).

28

Leffingwell entered the Capitol Building. *Id.*, ECF No. 31 at 2. But "Leffingwell was not content to merely stand inside the threshold":

> Positioned at the front of the line of rioters stacked hundreds deep behind him, Leffingwell chanted at the officers standing before him to "join us!" in the rioters' efforts to assault the Capitol. When some in the crowd shouted for the rest of the crowd to "back up," Leffingwell rebuked them, shouting "If you back up, you'll never get back in!" When U.S. Capitol Police Officers D.A and W.H tried to repel Leffingwell and the gathering crowd, **Leffingwell struck both officers in the head**.

*Id.* at 2 (emphasis added).

Specifically, Leffingwell "first punched Officer D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the head, before eventually punching Officer D.A. once more." *Id.* at 8. His conduct was so brazen that he was one of the few protesters arrested on the scene. *Id.* at 9. Leffingwell pled guilty to a felony offense under § 111(a)(1). *Id.* The government sought a sentence of 27 months of incarceration. *Id.* at 2. The Court imposed a sentence of ***six months incarceration*** with credit for time served, followed by 24 months of supervised release.

Consider *United States v. Mostofsky*, 21-cr-138-JEB (D.D.C. 2021). Mostofsky participated in a scrum of protesters pushing on a barricade held in place by police officers; entered the Capitol Building; and then stole a police vest and shield. He pled guilty to civil disorder under § 231(a)(3), misdemeanor theft of government property, and entry into a restricted area. He was sentenced to ***eight months incarceration***. Unlike Mostofsky, Hunter did not steal anything.

Finally, in *United States v. David Blair*, 21-cr-186-CRC (D.D.C. 2021), carrying a Confederate flag, Blair walked up to a police line outside the Capitol. He turned towards an officer and said, "What's up motherfucker, what's up, what's up bitch?" 21-cr-186, ECF No. 55,

p. 8.  When the officer came close to Blair, the defendant jabbed him with a lacrosse stick.  *Id.*
A search incident to arrest recovered a knife in the defendant's backpack.  21-cr-186, ECF No.
55, p. 8.  Blair pled guilty to a § 231(a)(3) offense.  This defendant was sentenced to ***five months
of incarceration***.  Just as in *Leffingwell*, Blair's acts could only be interpreted as intended to
inflict bodily injury or to threaten it.

Finally, as noted above, others with more serious conduct and some who physically
assaulted or came to Washington prepared for violence, or threatening to kill the Speaker of the
House and having the means to do so, were not charged as harshly as Hunter and/or were
offered guilty pleas with lenient sentences, even where they do not regret their criminal
behavior.  Dozens of defendants who entered the Capitol Building have received sentences of
probation.  *See* Exhibit C.

VI.    **CONCLUSION**

For any or all of the foregoing reasons and any reason(s) the Court finds after considering
the totality of the circumstances and facts of this case, as well as the sentencings factors under
USSG § 3553(2), this Court should find that a sentence of  3 years of probation, along with a
period of in-home detention coupled with community service is sufficient but no more than

necessary to fulfil the purposes of sentencing.  Such a sentence would not create many

unwarranted sentence disparities.


Dated: October 17, 2022

Respectfully submitted,

Edson A. Bostic, Esquire
The Bostic Law Firm
1700 Market Street, Ste. 1005
Philadelphia, PA 19103
(267)239-4693
Eab.bosticfirm@gmail.com
Attorney for Hunter Seefried

# EXHIBITS

# EXHIBIT-A

Hon. Trevor N. McFadden
U.S. District Court
U.S. Courthouse
333 Constitution Ave., NW
Washington, D.C. 20001

Dear Judge McFadden:

My name is Stephanie Seefried. I am Hunter's mother. I gave birth to and raised him and I have been with Hunter every day for the past 24 years.

I am writing you pleading that you show compassion and mercy when imposing sentencing on my child. You don't know how many tears I have shed over the decision that I made in agreeing that we all would go to the Capital on January 6, 2022, as Hunter's father sought. I regret even more not pushing back on the decision that we should follow the crowd walking in the Capital Building. I keep thinking that perhaps I had said no, and challenged my husband's request that the household make the trip, had I stood up to my husband and said no, we are not going with you, then Hunter would not have essentially ruined his life. But I did not.

Of all my children, I never once thought that I would have to write a court begging the judge to show leniency for Hunter because he has always been the most respectful, honest, kindhearted, and decent person and son that any parent could ask for. He has always been very respectful as a child and even now as a young man to his parents and older adults. Growing up, he has always been an obedient child and still is to this day. While my older two children had some difficulties as teenagers, Hunter never went off the tracks. His behavior in going into the Capital building on January 6th is so unlike him. Before that date, if you ask anyone that knows Hunter whether he would enter into a government building, far more the Capital building, without permission they would have said "Not Hunter!"

The Hunter that I raised and watch go up, is so much a different and better person than his actions in entering the Capital building. There are so many things I want to say about him. Hunter is an honest, responsible, caring young man. Hunter has always been the life of the party so to speak. Always smiling and laughing. Hunter is a hard worker. He has a work ethic you don't see these days in the younger generation. Hunter has worked every day since his father signed him out of school at 16, which I DID NOT consent to. Hunter is striving to have his own landscaping business. While working his full-time job, he has side jobs doing landscaping and recently detailing vehicles. Hunter isn't one to settle for less. He wants things in life. He has busted his back for everything he owns. Nothing has been handed to him. He has worked and earned it all.

We have raised our granddaughters, Hunter's nieces for the past 12 to 13 years. Hunter has stepped up and been the best uncle to them. More like an older brother. He has done so much for both of them. He is very protective over them as he should be. They are beautiful teenage girls. His little nephew is his sidekick. They both light up



when they see each other. Hunter has always helped around the house without an argument to do so. He takes care of the yard as well as the animals. Three of which aren't even his. Anytime a family member or friend calls Hunter is right there willing to help. He even helped a few neighbors and has never asked for anything in return. Hunter has used my vehicle a few times and filled the tank up before he brought it home. I didn't even have to ask. That may seem small to some,  but it shows me just how responsible and respectful he is.

January 6th forever changed our lives, and most importantly Hunter's. As I said, I wish that I had stepped up and put a stop to this idea of going to Washington, D.C. that day. I regret not doing so, and I know how much Hunter also regrets it. He also regrets going into the capital building. If he could go back in time and change that day he would. Hunter wouldn't even have gone that day if it weren't for his dad's decision that we all should go too. I've watched and listened to Hunter cry about this many times. How his choices that day have ruined his life. Hunter now has a felony on his record which has upset him terribly. Hunter isn't a criminal. Sending him to jail would change Hunter into someone he's not. He is young and has his whole life ahead of him as he struggles to live with a felony conviction.  He knows that he made a big mistake on January 6th. But I know that he will never make another mistake like this again.  I know that the Hunter that I have been so proud of over the years because of his kindness, respectfulness, and quiet and calm personality will never be back in court for any criminal act.  That is not who he is.

So, Judge McFadden, I ask you to please consider probation and or community service as punishment for the acts he committed.  Your Honor, I pray that you see the true person Hunter is and that his behavior on January 6th was a one-off for him.

I pray that you have mercy on him. Thank you.

Sincerely

Stephanie Seefried

Stephanie Seefried

2

 **Gmail**

**Edson A. Bostic, Esquire <eab.bosticfirm@gmail.com>**

---

**Letter of character for Hunter Seefried**

---

**Superior Drywall** <info@superdrywall.com>                                    Thu, Oct 6, 2022 at 12:43 PM
To: "eab.bosticfirm@gmail.com" <eab.bosticfirm@gmail.com>

October 6, 2022

Michael S. Myers

12878 E. Elliott's Dam Road

Laurel, DE  19956

Dear Mr. Bostic:

    My name is Michael Myers.  I am the owner of Superior Drywall, Inc in Dagsboro, DE and have been since 1979.  I am writing you regarding Hunter Seefried in order to express what I have observed his character to be as opposed to the way he is being portrayed.

    Hunter worked for me from 2018 to 2019 after which he began working for a local forklift company.  They released him once they learned about January 6th and I rehired him, he has been here since. I did so because I knew that he is not who the media portrays him to be.  He's an honest hard working young man and here he has shown good character and a strong work ethic.  He understands that it was wrong to enter the Capital but he was a young man caught up in the pressures of the moment and he made a mistake.  I shudder to think what will become of him were he to be incarcerated and I implore you for some other form of penance.

    Thank you for reading what I have to say.  I will add that if my personal testimony is required, I will be glad to give it.  I am in agreement that what he did was wrong, but I know him to be remorseful and he is no threat to anyone, and it is my sincere hope that Your Honor would be merciful to him.

Respectfully yours,

Michael S. Myers

**3**

Michael S. Myers

302-745-4761  Cell

302-732-9800  Office

4

Tatum R Otwell

14812 Johnson Rd

Laurel, DE 19956


Honorable Trevor McFadden

U.S. District Court Judge District of Delaware

     I am writing this letter on behalf of Hunter Seefried. Hi, I am Tatum Otwell, I am Hunter Seefrieds girlfriend. I have known Hunter for a little over a year and have been dating him for over three months. I am currently enrolled in the University of Lynchburg PA program, but I live in Laurel, Delaware.

     In a very short time I have learned that Hunter is hands down one of the best people I have ever met in my life. He is beyond hardworking, thoughtful, dedicated, caring, kind, compassionate, empathetic, generous, honest and loving. Hunter wants so much out of life and is working extremely hard to get it throughout everything going on in his life. He works a full time job on top of detailing cars and doing landscaping as well. I live in a house with my mom, who is a single mom of me and my sister. He without thought cuts our grass, waters our flowers, helps with whatever we need around the house and doesn't even put a second thought into it. He has helped me get whatever I need for college as well as supporting me 100% throughout my college career, that's just who he is, completely selfless and loving. No matter what Hunter is going through or doing he would drop it all to help someone else in need, he would give everything he owns to his family or friends if that's what it took. To tell you the truth I have never met anyone like Hunter, and I don't think I will ever meet anyone like him again. As his girlfriend I have gotten to see first hand who he really is outside of this case and within it and I can say that he is

5

more than this case and it doesn't define him. He loves with everything he has in him no matter what he's going through, and puts everyone else before himself without question. I have never met someone so selfless, caring, loyal, honest, kind and loving, people like him are few and far between and I am honored to say that I even know him let alone get to be loved by him.

This case has taken an extreme toll on Hunter, he hasn't been himself because of it. This case would take everything from him, his job, his friends, his family, me, and him. He lives for his family and friends and this case has not only affected him, but all of us as well. Taking him away from all of this would not only break his heart but it would break everyone's heart that knows him, because we all know how amazing he really is. I would be devastated to see anything happen to him as I know whole heartily he doesn't deserve any of this.

I sincerely hope you take all of this into consideration and learn a little more about how amazing Hunter Seefried really is and who he is as a person outside of just this case.


Sincerely,

Tatum Otwell


Email: Tatumotwell11@gmail.com

6

Honorable Trevor McFadden

U.S. District Court Judge District of Delaware

My name is Kevin, I am the brother of hunter.

I am a carpenter I work on upscale homes in the Rehoboth beach area. Company name Douglas & Co.

I have struggled with addiction throughout the past 10 years which has sometimes put strain and distance in our relationship. But even still my brother never gave up on me never stopped loving me and was there for me whenever I was in need. He's helped look after my daughters when I wasn't fit to be in their lives. He's forgiven and helped me in forgive myself so I can move on to a new chapter in my life.


Our father is a very opinionated person who likes to force his ideology on us. I believe he should of used better judgement when leading his son into such a volatile situation. Having said that, Hunter is still his own man and will have to face whatever consequences await him at trial.

It's not for me to judge right or wrong of the situation. But I do know if there wasn't thousands of people yelling and egging my brother on, he wouldn't have made the split second decision that he did. This has affected him and our family in a very negative way. Loss of jobs/work, death threats, users of social media attacking our character.

I just don't want this one decision to affect the rest of my brother's life he has so much more to offer society. Mistakes were made and I know he has learned a valuable lesson. Given a second chance I know he will make the best of it.


Very truly yours

Kevin Seefried

7

 Gmail

**Edson A. Bostic, Esquire <eab.bosticfirm@gmail.com>**

## Fwd: Hunter Seefried/Character Letter
1 message

**Hunter Seefried** <seefriedhunter84@gmail.com>                     Mon, Aug 1, 2022 at 8:12 AM
To: "Edson A. Bostic, Esquire" <eab.bosticfirm@gmail.com>

---------- Forwarded message ---------
From: **Stephanie Seefried** <mamaseefried@gmail.com>
Date: Mon, Aug 1, 2022, 8:06 AM
Subject: Fwd: Hunter Seefried/Character Letter
To: <seefriedhunter84@gmail.com>

---------- Forwarded message ---------
From: **Pam Price** <pam@pampriceandassociates.com>
Date: Sun, Jul 31, 2022, 11:51 PM
Subject: Hunter Seefried/Character Letter
To: mamaseefried@gmail.com <mamaseefried@gmail.com>

Hello, my name is Pamela Price. I own the local Remax real estate office in Laurel, De. Over the last 2 years I have sold over 350 houses in our area, ranking #1 in the state of Delaware in 2021 and 2022. Selling that many houses has me continually needing help with odd jobs. Anything from cutting grass, whole house clean outs and small repairs. I can call on Hunter and get an immediate response. He always speaks to people with respect…saying "yes ma'am and yes sir". He is respectful, polite and is always kind to everyone when I have crossed paths with him over the last several years. Even when he is in a party atmosphere, he is the quietest in the room.
I was blessed to meet Hunter through his uncle, whom I was very close friends with, for over 20 years, until he passed of an aggressive cancer, in September 2021.

Although I was beyond shocked by Hunter's involvement in the Capitol Riot, I have to believe that if his father had not encouraged it, Hunter would never have been any where near the Capitol building and definitely would not have committed a crime. From a very young age we look up to our parents and follow their lead and direction, good or bad.

I want to share with you a text message, so you can see the true, Hunter Seefried. One of my family members needed their grass cut, so I reached out to him. On May 27, 2022 he contacted my family member for the first time to arrange payment for grass cutting and has never met her in person or talked to her before this day. On June 16th, 2022 he happened to be traveling on the road that he cuts her grass on. He saw a car stopped half way down her driveway, so he text her to make sure everything was ok. He didn't know what she drove and had only talked to her on the phone about payment arrangement, but being the guy he really is he text to check on her…someone he doesn't even know. Those kind of people are few and far between.

I will close with this…I have a strong police background. My father is a 33 year veteran of the Maryland State Police, now retired and my sister is the Judicial Case Manager Supervisor, in Superior Court in Sussex County, De for over 13 years and over 7 years in Wicomico County, Md. Most recently I was a huge advocate for the Delmar Police Department after losing Cpl. Heacook, after responding to a call alone, to a fight in progress because of a severe shortage in officers, due to low pay and department morale. I was one of the loudest voices to push for SB 181 to be passed, which passed unanimously and was able to give the officers huge raises to bring their pay to be comparable with surrounding towns. So at no time do I think what Hunter did is acceptable, I just think if we look at the bigger picture you would see there was definitely a procuring cause. Someone that should have been setting a good example. I feel Hunter would be more suited to have probation and community service hours so he can prove that he is a good human and can make good decisions, while serving throughout his community.

*8*

If you have any questions at all, please don't hesitate to contact me. Thank you for taking the time to read about Hunter.

Sincerely,
Pam Price
Broker/Owner
Remax Coast & Country
O-302-846-0200
C-302-249-2546

 image1.jpeg

Sent from my iPhone

---

**2 attachments**



**image1.jpeg**
52K

**image1.jpeg**
52K

9

To the Honorable Judge Trevor McFadden,

I am writing this letter in regards to Hunter Seefried. My name is Melania Moore. I am a School Counselor for the Woodbridge School District. I have known Hunter for almost two years. We have several mutual friends that we surround ourselves with.

When getting to know Hunter I know that he is quiet and reserved. He conversates with people that he knows and trusts and tries to keep his circle small. He loves his family, especially his mom, and would do anything in the world for them. I have also seen him interact with small children and being around children myself I can tell that they adore him. I know in the future he would make an excellent dad. He is soft spoken and has a good heart. Recently, I had a birthday in which he was invited to. We made sure to stay local just so he could attend. We went axe throwing. He didn't participate but he kept saying how grateful he was to be able to come and just hang out for a while. He is always appreciative of our friendship because he values that and tells me all the time.

My husband and I live a comfortable lifestyle and I have often heard him tell my husband that he wants that too. We have talked about the hard work and dedication that it takes to get to where we are and he is willing to do that and has tried to do that for himself and his family. Not only does he have a full-time job but also details cars on the side. He detailed my daughter's car and did a wonderful job; better than the auto detailers that are local. This shows he is industrious and taking those chances to better himself. I would say he is focused and determined to set goals and turn those goals into reality.

I know that this trial has taken a lot from him, however. His girlfriend that he thought he would spend the rest of his life with suddenly broke up with him and he was devastated. I have never seen a guy cry so hard. He was so heartbroken and distraught. He kept to himself for a while but then started to come around again. He did meet someone else and this girl has been a saving grace for him. They say everyone we meet has a purpose in our life even if it's only for a little while. Even if her purpose for right now is to keep his spirits up she is the perfect one to do it. I have never seen Hunter in trouble, not even an argument, and I can't begin to imagine what he is going through.

I am unaware of any ill intentions that Hunter may have wanted to portray, but to me, maybe it was a tiny voice of hope that needed to get out in these crazy times. I can't debate what a tough job you as the judge have in these proceedings but I can relate and understand how our personal values and views can be suppressed and our morals tossed to the side. Regardless, I know that Hunter would be grateful and in debited to you for your mercy and grace and would know what a valuable lesson this would be for his life.

Please feel free to contact me with any questions. My cell phone number is (302) 236-8109 and my email is Melania.joseph80@gmail.com. Thank you for your time and your service.

Sincerely,

Melania Moore

 Gmail

**Edson A. Bostic, Esquire <eab.bosticfirm@gmail.com>**

## Fwd:
1 message

**Hunter Seefried** <seefriedhunter84@gmail.com>                                    Mon, Aug 1, 2022 at 8:13 AM
To: "Edson A. Bostic, Esquire" <eab.bosticfirm@gmail.com>

---------- Forwarded message ---------
From: **Stephanie Seefried** <mamaseefried@gmail.com>
Date: Mon, Aug 1, 2022, 8:07 AM
Subject: Fwd:
To: <seefriedhunter84@gmail.com>

---------- Forwarded message ---------
From: **Lisa Tubbs** <tubbs266@gmail.com>
Date: Mon, Aug 1, 2022, 7:42 AM
Subject:
To: Stephanie Seefried <mamaseefried@gmail.com>

I'm writing this letter in regards to Hunter Seefried. My name is Lisa Tubbs Hunter is my nephew. Hunter is the hardest
working young man I believe I've ever known. Hunter has a kind heart and is Love by many. Hunter has always been a
respectful kind-hearted and loving young man. I've only ever known Hunter to have put others before himself and has
shown nothing but respect. There are so many good things to say about Hunter but the one thing that comes to mind the
most is that the love he has for his family is unconditional. I love Hunter and I'm so very blessed to have him in my life
he's a unique young man. And anyone who is to meet him and spend more than 5 minutes with him would draw the same
conclusion.
    Sincerely,
    Lisa Tubbs

 Gmail

**Edson A. Bostic, Esquire <eab.bosticfirm@gmail.com>**

## Fwd: Hunter
1 message

**Hunter Seefried** <seefriedhunter84@gmail.com>
To: "Edson A. Bostic, Esquire" <eab.bosticfirm@gmail.com>

Sat, Jul 30, 2022 at 10:38 AM

---------- Forwarded message ---------
From: **Stephanie Seefried** <mamaseefried@gmail.com>
Date: Sat, Jul 30, 2022, 10:34 AM
Subject: Fwd: Hunter
To: <seefriedhunter84@gmail.com>

---------- Forwarded message ---------
From: **Joseph Pastic** <jpastic@gmail.com>
Date: Fri, Jul 29, 2022, 9:04 PM
Subject: Hunter
To: mamaseefried@gmail.com <mamaseefried@gmail.com>

My name is Joseph Earl Richardson. I'm in Retail Management and a business owner. I have known Hunter Seefried for about 4 years as he is my husband's cousin. Through the time I have known Hunter he has always been a kind, caring and a generous and outgoing young man. He is always there to help out if you need it. He has helped us with lawn care, moving items for the store and hauling off yard waste. Hunter has ambitions for the future which include operating his own lawn care business. I have never known Hunter to say a cross word towards anyone. He is always happy and outgoing. Very Respectfull to everyone I have seen him around. I have spent many hours with him in the past few years and I can only imagine how a prison sentence will destroy his spirit and love of life. I do believe this is an isolated incident and in no way shows who Hunter really is.

12

July 28, 2022

Subject: Character Reference

To Whom It May Concern:

I have known Hunter Seefried for as long as he has been alive, since I have known his father Kevin for 30 plus years.

By all accounts Hunter is a hard working young man and along with his father has come and helped out with some jobs of doing drywall in my home as well as my daughters house.

Usually where you see his dad, you will see Hunter.

Hunter also has been a past member of our Hunting Club and helped out when needed as a guide for the hunting casts and setting up for bench shows and such.

Hunter is a good kid and has a close relationship with his Parents, siblings, and nieces.

I have never known him to be in any trouble and truly believe given the opportunity he would make the decision to change that day in Washington.

Hunter is an honest trustworthy young man with a good heart. I believe he has had time to reflect on the situation and is incredibly remorseful for that decision.

I hope you take these statements into consideration for sentencing and see fit to give Hunter a second chance.

Thank You,


James Nichols

36440 August Rd

Delmar, DE 19940

13

# EXHIBIT-B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CASE NO. 1:21-cr-00159-ABJ |
| | : | |
| CLEVELAND GROVER | : | |
| MEREDITH, JR. | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Sentencing Memorandum.

### I.     Introduction

The Defendant, Cleveland Grover Meredith, Jr., (hereinafter "Defendant") drove from Colorado to Washington, D.C., and while in route, and after arriving there on January 6, 2021, sent several text messages threatening to engage in violence in D.C.  *See* ECF, 47 (agreed "Statement of Offense"), ¶¶ 1,2, 5.   Defendant remained in D.C. on January 7, 2021, and sent a text message threatening to shoot Speaker of the House Nancy Pelosi.  *See* ECF, 47, ¶ 2. Defendant's mother contacted the FBI to warn of Defendant's threats and to prevent her son from harming himself and others. *See* ECF, 47, ¶ 3.  Defendant was arrested in a hotel in D.C. before he could carry out his threats. *See* ECF, 3. He had in his possession an assault-style rifle with a telescopic sight, a 9 mm semi-automatic firearm, over 2,500 rounds of ammunition, and multiple high-capacity magazines. *See* ECF, 47, ¶ 6.

Defendant has been charged in this case with violations of 18 U.S.C. § 875(c) (Interstate Communication of Threats); D.C. Code § 7-2502.01(a) (Possession of Unregistered Firearm);



1

Case 1:21-cr-00159-ABJ Document 44 Filed 12/08/21 Page 2 of 29

D.C. Code § 7-2506.01(a)(3) (Possession of Unregistered Ammunition); and D.C. Code § 7-2506.01(b) (Possession of Large Capacity Ammunition Feeding Devices). *See* ECF, 28 (Superseding Indictment). On September 10, 2021, Defendant pled guilty to one count of making felony threats in violation of Title 18 U.S.C. § 875(c). *See* ECF, 46.

Probation has determined that Defendant's base offense level is 12, and that 6 levels should be added pursuant to U.S.S.G. § 2A6.1(b)(1) because his offense involved conduct evidencing an intent to carry out his threat. Presentence Investigation Report (PSR), ¶¶ 25, 26. Probation also calculated a 6-level increase in the offense level pursuant to U.S.S.G. § 3A1.2(b) because the victim was a government officer (United States Speaker of the House Nancy Pelosi) and Defendant's threats were motivated by her status. PSR, ¶ 27. This latter enhancement is one the parties did not anticipate. *See* ECF 46 (Plea Letter), at 3. After accounting for Defendant's acceptance of responsibility and his criminal history, Probation has determined that Defendant's total offense level is 21, PSR ¶¶ 32-34, his criminal history category is I, PSR ¶ 37, and his guideline range of imprisonment is 37 to 46 months. PSR, ¶ 100.

In their plea agreement, the parties anticipated a guideline range of either 6 to 12 months imprisonment or 18 to 24 months imprisonment, based upon the Defendant's criminal history, the offense level that the parties estimated, and the Court's determination of whether U.S.S.G. § 2A6.1(b)(1) applied. *See* ECF 46, Plea Letter, at 4. The parties nevertheless reserved the right to allocute for a sentence within the guideline range ultimately determined by the Court if that range was different from the estimated guideline range the parties had initially anticipated. *See*

ECF 46, at 5.[1]

 The Government acknowledges that based on applicable case law relevant to this analysis, the plea agreement should have accounted for the official victim enhancement pursuant to U.S.S.G. 3A1.2(b). To be clear, consistent with the plea agreement, the government is not advocating for imposition of that enhancement. *See* ECF No. 46, at 4 ("Except as provided for in the "Reservation of Allocution" section below, the parties also agree that neither party will seek any offense-level calculation different from the Estimated Offense Level calculated above in subsection A".) However, the parties have "reserve[d] the right to answer any related inquiries from the Court or the presentence report writer, and to allocute for a sentence within the Guidelines range, as ultimately determined by the Court, even if the Guidelines range ultimately determined by the Court is different from the Estimated Guidelines Range calculated herein." *Id.* at 5. As authorized by that provision, if the Court determines that the official victim enhancement in U.S.S.G. 3A1.2(b) applies and the applicable Guidelines range is 37 to 46 months, the Government will allocute for an appropriate sentence within that range. We believe that a mid-guideline range custodial sentence, followed by 3 years' supervised release would be

---

[1] The Plea Letter state as follows:

> In the event that the Court or the presentence report writer considers any Sentencing Guidelines adjustments, departures, or calculations different from those agreed to and/or estimated in this Agreement, or contemplates a sentence outside the Guidelines range based upon the general sentencing factors listed in 18 U.S.C. § 3553(a), the parties reserve the right to answer any related inquiries from the Court or the presentence report writer and to allocute for a sentence within the Guidelines range, as ultimately determined by the Court, even if the Guidelines range ultimately determined by the Court is different from the Estimated Guidelines Range calculated herein. *See* ECF, 46 at 5.

"sufficient but not greater than necessary" here. *See* 18 U.S.C. § 3553(a). That sentence would reasonably take into account the danger of threatening a public official – even privately to family and friends – particularly when such threats are coupled with dangerous behavior, such as traveling thousands of miles with firearms and ammunition that one threatens to use. Since the purpose of the Federal Sentencing Guidelines is to make sentencing more structured and certain, *see* "An Overview of the United States Sentencing Commission – January 5, 2011" (available at https://www.ussc.gov/sites/default/files/pdf/about/overview/USSC_Overview.pdf), and the guidelines, although advisory in nature, are presumptively reasonable, *Rita v. United States*, 551 U.S. 338 (2007), the Government submits that imposition of the correct guidelines helps ensure consistency across the United States, and does not permit certain defendants to seek windfalls as a result of enhancements that the government overlooked in a plea agreement.[2]

Similarly, if this Court finds that the official victim enhancement does *not* apply, we would also request a custodial sentence at the mid-range of the Court-decided guidelines, followed by 3 years of supervised release.

## II.     Factual and Procedural Background

Defendant drove from Colorado to Washington D.C. and arrived in the evening of January 6, 2021 after the riots at the U.S. Capitol had ended. Defendant planned to participate in rallies supporting President Trump but arrived too late to attend. *See* ECF 47, ¶ 1. On January 1, 2021, before he began his drive to D.C., Defendant posted the following message on Facebook

---

[2] On November 17, 2021, the Government informed defense counsel of its intention to allocate within the guideline ultimately determined by the Court, but that it would not oppose Defendant's withdrawal from the validly-entered September 10, 2021 plea agreement should Defendant choose to do so.

4

forecasting his actions for the days to come:

**Posted** 2021-01-01 20:19:35 UTC
**Status** Allow your enemy to be boastful, to think he has won.  Present yourself as weak, disorganized.  Then eradicate

Defendant began his trip to D.C. on January 4, 2021.  While in route, he sent several menacing and threatening text messages. *See* ECF 47, at 5; *See* Exhibit 1 (Defendant's text messages, with redacted third-party identities.).

On January 4, 2021, Defendant sent text messages that stated as follows:

- 5000rds of armor piercing green tip 5.56[3] in ma truk

- We're gonna surround DC and slowly constrict

*See* Exhibit 1.

On January 6, 2021, Defendant was still driving to D.C. and had vehicle problems. Early in the afternoon, Defendant texted a picture of his truck and trailer and stated, "Just fixed…head to DC with a shit ton of 5.56 armor piercing ammo." *See* Exhibit 1.

Later on January 6th, one of Defendant's friends told him about the riot at the Capitol and Defendant responded, "Burn DC to the FKG ground".  To another friend he proclaimed, "War time".  About two hours later, Defendant sent texts stating:

- Ready to remove several craniums from shoulders

- I'm so ready to FK SOME TRAITORS UP

- I''m gonna collect a shit ton of Traitors heads

---

[3] Referring to 5.56 x 45 millimeter rifle cartridges.

*See* Exhibit 1. Another friend texted Defendant stating, "I think Trump wants you to go home peacefully!!" Defendant responded, "Bullshit, he wants HEADS and I'm gonna deliver". As Defendant continued driving to D.C., he texted, "Hauling ass, 3.5 hours from target practice" … "It ain't just me, someone has to take the TRASH out, FK THESE MTHRFKRS" *See* Exhibit 1.

On January 7th, Defendant remained in D.C. and sent the following text messages:

- I wonder if trump still has something. Lord I hope so
- I may wander over to the Mayor's office and put a 5.56 in her skull, FKG cunt
- I hope you're reading this Mr. FBI agent, FK U

*See* Exhibit 1. A friend asked Defendant, "You back tonight?" and Defendant, stated, "Strategizing on best way to assault this city...do I go in fast on Sportbike or do I go in the back door on dirt bike Staying one more day since I got here late, need to FK with these commies." Defendant later referred to the Mayor of D.C. as a "C U N T", and then threatened, "Thinking about heading over to Pelosi CUNT's speech and putting a bullet in her noggin on Live TV." *See* Exhibit 1. He then sent the following texts:

- You get that one Mr. Marxist FBI Agent? Go FK yourself
- Thinking about heading over to Pelosi CUNT's speech and putting a bullet in her noggin on Live TV. You get that one Mr. Marxist FBI Agent? Go FK yourself.
- I ain't goin to jail, the morgue maybe, not jail
- How much u give me to go trench the Capital lawn with ma big truk?
- I'm gonna run that CUNT Pelosi over while she chews on her gums
- Dead Bitch Walking
- I predict that within the next 12 days, many in our country will die

*See* Exhibit 1. One of Defendant's friends then texted Defendant, "Cleve, I know you're kidding, really, but for your own good, please do [sic] text direct threats like that. It's actually illegal, isn't it, to say "I'm going to _____" If u believe in deep state, then u surely believe the left will protect itself by prosecuting it's enemies that happen to slip up and break a law, right?" Defendant responded by texting a picture of himself wearing a black balaclava and warned that, "I'm gonna walk around DC FKG with people by yelling "Allahu ak Bar" randomly". *See* Exhibit 1.

Defendant's relative, who interpreted Defendant's statement that he was threatening to shoot Speaker of the House Pelosi, contacted Defendant's mother, who then contacted the FBI as she was concerned for the safety of Defendant and others. *See* ECF 47, at 3; PSR, ¶ 12. The FBI located Defendant in a Holiday Inn Hotel on C Street in Southwest Washington D.C. on the night of January 7, 2021; the hotel is approximately one mile from the U.S. Capitol as shown in the image below.



After waiving his *Miranda* rights, Defendant agreed to be interviewed by FBI agents. He also gave the agents consent to search his telephone, his truck, and his trailer. *See* ECF 47, at 4.

The agents examined the contents of Defendant's telephone, in which they found the text messages set forth above. Defendant admitted that he sent those messages from January 4 to 7, 2021 while in Colorado and Washington D.C. and in route to Washington, D.C. *See* ECF 25, at 5.

In Defendant's trailer, which he drove to Washington D.C. and parked at the hotel, the FBI agents found a Glock 19, nine-millimeter handgun, and a model IWI Tavor X95 rifle, approximately 2,500 rounds of ammunition, and 10 large capacity ammunition feeding devices. *See* ECF 47, at 5, 6.  Those rounds included:

* Approximately 856 loose and boxed 9 mm cartridges;

* Approximately 320 loose, green tipped, LC17 rifle cartridges;

* Approximately 1001 loose, copper-color tipped, 5.56 mm rifle cartridges;

* Approximately 94 loose 30-30 rifle cartridges;

* Two 15-capacity 9 mm magazines containing approximately 29 total cartridges;

* Two 31-capacity 9 mm magazines containing approximately 62 total cartridges;

* One 50-capacity 9 mm drum magazine containing approximately 53 total cartridges;

* Five 5.56 mm rifle magazines containing a total of 118 cartridges (110 copper-color tipped cartridges and 8 green tipped cartridges); and

* One 9 mm expended cartridge case.

8

The firearms and ammunition are shown in the photographs below:





Defendant also had an all-terrain vehicle (ATV) and motorcycles in his trailer as shown in the photographs below:

9

# EXHIBIT-C

**SAMPLE OF DEFENANTS SENTENCED TO PROBATION**

| 1/6 Def. & Case No. | Charge | Sentence | Offense Conduct |
|---|---|---|---|
| Josh & Jessica Bustle, 21cr238 | Parading in Capitol | 24 mos. probation and 24 mos. supervised release | Entered Capitol Building, remained for 20 minutes. Posted on Facebook, "Pence is a traitor. We stormed the capital (sic). . . We need a revolution!" |
| Bryan Ivey, 21cr267 | Parading in Capitol | 36 mos. probation | Entered Capitol Building through a breached window, waving additional rioters into the building, spending 30 minutes inside. |
| Valerie Ehrke, 21cr97 | Parading in Capitol | 36 mos. probation | Entered Capitol Building. |
| Andrew Bennett, 21cr227 | Parading in Capitol | 3 mos. home confinement, 24 mos. probation | Entered the Capitol Building, livestreaming the event on his Facebook page for over an hour. |
| Lori, Thomas Vinson, 21cr355 | Parading in Capitol | 5 years probation, 120 hours of community service | Entered the Capitol Building, later telling news outlet that her actions were "justified" and that she would "do this all over again." |
| Jordan Stotts, 21cr272 | Parading in Capitol | 24 mos. probation | Entered the Capitol Building, remained inside for an hour, celebrating with others and taking videos with his cell phone. |



| | | | |
|---|---|---|---|
| Glen Croy, 21cr162 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building. Chief Judge suggested at plea hearing that parading offense is not conceptually different from government's obstruction of justice charge under § 1512(c)(2) |
| Douglas Sweet, Cindy Fitchett, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, Fitchett filming herself saying, "We are storming the Capitol. We have broken in." |
| Eric Torrens, 21cr204 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking celebratory pictures in the Crypt. |
| Rasha Abdual-Ragheb, 21cr42 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, desiring to demonstrate against Congress. |
| Jonathan Sanders, 21cr384 | Parading in the Capitol | 36 mos. probation, 60 hours community service | Entered the Capitol Building, intending to protest presidential election |
| Michael Orangias, 21cr265 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures inside. |
| John Wilkerson, 21cr302 | Parading in the Capitol | 36 mos. probation, 60 hours of community service | Entered the Capitol Building, posting on social media, "today was a good day, we got inside the Capitol." |

| Brandon Nelson, 21cr344 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, codefendant texting, "We stormed the Capitol and shut it down. Currently still inside" and "Patriots won't go down without a fight." |
|---|---|---|---|

| Andrew Wrigley, 21cr42 | Parading in the Capitol | 18 mos. probation | Entered the Capitol Building, taking pictures of himself inside |
|---|---|---|---|
| Jacob Hiles, 21cr155 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures showing him smoking "an unknown substance" inside. |
| Bruce Harrison, 21cr365 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures of himself inside. |
| Terry Brown, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, disobeyed police order to leave. |
| Felipe Marquez, 21cr136 | Disorderly conduct in the Capitol | 18 mos. probation | Entered the "hideaway" office of Senator Merkley, saying, "We only broke a couple windows." |
| Michael Rusyn, 21cr303 | Parading in the Capitol | 24 mos. probation | Among the first to enter the Capitol through a certain door, part of a group of people who shouted, "Tell Pelosi we're coming for that b****," called police traitors, and shouted "Stop the steal." |

| Andrew Hatley, 21cr98 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures with various historical statues. |
|---|---|---|---|
| Nicholas Reimler, 21cr239 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures of himself and friends. |
| Caleb Jones, 21cr321 | Parading in the Capitol | 2 mos. home confinement, 24 mos. probation | Entered the Capitol Building, "walking down numerous hallways and into the Capitol Rotunda." |

| Anthony R. Mariotto, 21cr94 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, posting on Facebook, "This is our house" under selfie photograph. |
|---|---|---|---|
| Michael Stepakoff, 21cr96 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, posting on social media after, "The Capitol is OUR house, not theirs." |
| Tanner Sells, 21cr549 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building. |
| Gary Edwards, 21cr366 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, including Senate office S140. |
| Zachary, Kelsey Wilson, 21cr578 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, penetrating all the way to the Speaker's personal office |
| Jennifer Parks, Esther Schwemmer, 21cr363 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures inside |
| Jackson Kostolsky, 21cr197 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building |
| Eduardo Gonzalez, 21cr115 | Parading in the Capitol | 24 mos. probation | Entered the Capitol, smoking marijuana inside "multiple times." |

| Israel Tutrow, 21cr310 | Parading in Capitol | 36 mos. probation | Entered the Capitol Building with a knife |