**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-287 (TNM)** |
| **HUNTER SEEFRIED,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Hunter Seefried to 64 months' incarceration, the midpoint of the sentencing guidelines range of 57-71 months as calculated by the government and the Probation Office, three years of supervised release, $2,000 in restitution, and the mandatory $170 special assessment for the five counts of conviction.

## I.    INTRODUCTION

Hunter Seefried, a 24-year-old delivery driver for a drywall company, who resides in Laurel, Delaware, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] As of October 13, 2022, the approximate losses suffered as a result of the siege at the United

1

Hunter Seefried's participation in the riot was purposeful, aggressive, and rife with disregard and disrespect for the police officers whose duty on January 6 was to protect the Capitol and guard the peaceful transition of power during the election certification process. Seefried believed that former President Trump lost the 2020 election as a result of unprecedented fraud. Government's Trial Exhibit 301 at 21:15-23:52. In the early morning hours of January 6, Seefried traveled from his home in Laurel, Delaware, with his family, including his father and co-defendant, Kevin Seefried, to attend the Stop the Steal rally in Washington, D.C. After attending the rally, Seefried and his father, along with thousands of others, entered the Capitol grounds and approached the northwest side of the Capitol building, where police officers were attempting to maintain a barrier to protect the Capitol and the proceedings inside. There, the Seefrieds climbed over a wall near a stairwell and scaffolding in order to get closer to and eventually gain access to the building.

After rioters breached the barrier, Seefried and his father approached the Capitol building as part of a large mob of rioters who were attempting to make entry into the building, near the Senate Wing Door. Seefried watched as the rioters damaged the Capitol building by violently breaking a window near the Senate Wing Door. After the window was broken, Seefried cleared out the remaining glass shards, enabling his and others' entry into the Capitol through the window. Upon entering the Capitol, Seefried joined with other rioters as they berated and harassed numerous United States Capitol Police ("USCP") officers. Seefried stood resolute with the rioters, who demanded to know the location of the United States senators and representatives who gathered

---

States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

on January 6 inside of the Capitol to certify the votes of the Electoral College. Seefried himself attempted to engage with police officers about the "fraud" that he believed had occurred in connection with the presidential election. During the 25 minutes that he remained inside of the Capitol, Seefried ignored the officers' orders to leave the building.

The government recommends that the Court sentence Seefried to 64 months' incarceration, the midpoint of the advisory Guidelines' range of 57-71 months, which the government submits is the correct Guidelines calculation. A 64-month sentence reflects the gravity of Seefried's conduct.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Seefried among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

At approximately 2:00 p.m., certain individuals forced their way over the barricades that had been erected around the Capitol building and grounds and past police officers protecting the building and those inside, and the crowd advanced to the exterior of the building. Government's Trial Exhibits 401, 403, 404. At that time, members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election; Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber. Government's Trial Exhibits 605, 705A.

Shortly after 2:00 p.m., individuals in the crowd forced their way into the Capitol building, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on. Government's Trial Exhibit 401.

3

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. Government's Trial Exhibit 705A at 426-435. All proceedings, including the joint session, were effectively suspended. *Id*.

### Injuries and Property Damage Caused by the January 6, 2021 Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and

Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See Id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

**B.      Defendant's Role in the January 6, 2021 Attack on the Capitol**

*i.      Hunter Seefried's approach to and breach of the U.S. Capitol*

The evidence at trial showed that Seefried believed that former President Trump lost the November 2020 election as a result of fraud. Seefried was angry and determined to fight against what he believed was a stolen election. Seefried and his family, including his father and co-defendant Kevin Seefried, traveled to Washington D.C. from their residence in Laurel, Delaware, to attend the Stop the Steal rally and to hear Trump speak. After attending the entire rally, the family stopped at their vehicle before continuing to the Capitol building along Pennsylvania Avenue.

Shortly before 2:00 p.m., along with thousands of others, Seefried entered the grounds and approached the Capitol from the northwest. Approximately one hour earlier, at 12:52 p.m., rioters had first breached the outer perimeter of the Capitol Grounds,[2] near the Peace Circle at the end of Pennsylvania Avenue (Area A in Exhibit 1, below), shoving the handful of USCP officers stationed at the barriers there out of the way and flooding onto the Lower West Plaza of the Capitol

---

[2] The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" *See* Trial Tr. at 29-31, 06/13/202; Government Trial Exhibits 525 and 526.

(Area C in Government Exhibit 1, below). *See* Government Trial Exhibit 401.



*Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

Seefried and his father climbed over a wall in order to access a stairwell running alongside scaffolding in the Northwest section of the U.S. Capitol building and grounds – Area D in Exhibit 1, above. *See* Government Trial Exhibit 501. At approximately 2:09 p.m., rioters broke through a line of USCP officers on the landing of that stairwell and the mob surged towards the Capitol building. *See* Government Trial Exhibits 403 and 404. Slightly more than a minute later, Seefried and his father – who was carrying the Confederate Battle flag – ascended the stairwell and marched

with the mob of rioters to the Capitol building. *Id.*



*Government Trial Exhibit 403A*
*(Hunter Seefried circled in red)*

Seefried was approximatly one minute behind the first rioters to breach this police line. However, he was was intent on makinge his way into the Capitol building in order to disrupt the certification of the Electorical College vote count. Upon approaching the Capitol building, Seefried sped past other rioters as he made his way to the Senate Wing Door, such that he was in the group of rioters immediately outside of the building as it was being breached at approximately 2:12 p.m. As he told the FBI during his interview, that was where "all the commotion was." Government Trial Exhibit 301 at 55:35-55:48. Seefried witnessed other rioters use various objects—including a police riot shield and a 2x4 piece of lumber—to break the large windows just to the right of the Senate Wing Door:



*Still from Government Trial Exhibits 504 and 527*



*Still from Government Trial Exhibits 504 and 527*



*Still from Government Trial Exhibits 504 and 527*

Seefried, wearing gloves, approached the window and used his fist to clear the glass that remained in one of the broken windowpanes, clearing the way for rioters to enter the interior of the building through the window.



*Still from Government Trial Exhibit 527*
*(Hunter Seefried indicated with green arrow)*

10

Seefried himself jumped up to the window's ledge. While crouched in the window, Seefried observed a uniformed USCP officer standing inside the building. The officer pointed a can of pepper spray towards Seefried. Seefried ignored the officer's warning to not enter the building and instead pulled himself through the window.



*Still from Government Trial Exhibit 527*
*(Hunter Seefried indicated with green arrow;*
*USCP Officer circled in blue)*



*Still from Government Trial Exhibits 407 and 527*
*(USCP Officer circled in blue)*

During his post-arrest interview with the FBI, Seefried acknowledged that he presented a threat to the officers inside the building, stating "I was the threat comin' in the goddamn window. I mean, if I did get hurt, I couldn't blame that guy." Government's Trial Exhibit 301 at 1:37:23 to 1:37:31.

Seefried was the fourth rioter to set foot inside the building, thereby making him one of the first of as many as two thousand rioters who would enter the Capitol building on January 6.



*Still from Government Trial Exhibit 527*
*(Hunter Seefried indicated with green arrow)*



*Still from Government Trial Exhibit 527*
*(Hunter Seefried indicated with green arrow)*

At this time, the Joint Session was underway, and Senators were in the Senate chamber debating

an objection to Arizona's electoral votes. Shortly after the building was breached, United States

Secret Service agents ushered Vice President Pence and his family members from the Senate

Chamber and directed them to a secure location within the Capitol.

###### ii. *Seefried and the mob of rioters chase USCP Officer Eugene Goodman*

Prior to engaging the agitated crowd inside of the Capitol building, USCP Officer Eugene Goodman responded to the growing crowd of rioters as they approached the West Front. Trial. Tr. at 93-97, 06/13/2022. After being teargassed multiple times while assisting his fellow officers, Officer Goodman went inside of the Capitol building to respond to a breach occurring inside of the Rotunda. Trial. Tr. at 95-97, 06/13/2022.

After leaving the Rotunda, Officer Goodman heard via radio dispatch that the Senate had been breached. Trial. Tr. at 101, 06/13/2022. Upon arriving at the East Grand Staircase of the Senate Wing, Officer Goodman encountered Kevin Seefried, who was still armed with his Confederate Battle flag. Trial. Tr. at 102, 06/13/2022. Officer Goodman commanded Kevin Seefried to leave the building. Trial. Tr. at 105, 06/13/2022. In response, Kevin Seefried used his flagpole to make jabbing motions in Officer Goodman's direction. *Id.* As Kevin Seefried continued to ignore Officer Goodman's commands, he was joined by other rioters who had formed a small mob near the staircase.

Video evidence shown at the trial captured the mob of rioters prior to and during their encounter with Officer Goodman. Government Trial Exhibits 504, 505. After breaching the Capitol at the Senate Wing Door, the rioters entered the building, yelling and cheering during their entrance. The rioters hurried through the first floor, hastily making an approach to the stairwell where Officer Goodman and Kevin Seefried were engaged in their standoff. The rioters repeatedly yelled, "Where are they counting the fucking votes?" and "Where are the senators?" Government Trial Exhibit 504 at 00:50. The mob continued to advance towards Officer Goodman. Trial. Tr. at

112-119, 06/13/2022. In an effort to steer the mob towards other police officers who could provide

backup, Officer Goodman led them up the East Grand Staircase. As the rioters continued to yell,

berate, and threaten Officer Goodman, Hunter Seefried joined the group as they followed Officer

Goodman up the staircase, staying towards the front of the pack. Government Trial Exhibits 504,

505, 506, and 507.



*Still from Government Trial Exhibit 506*
*(Hunter Seefried circled in red; Officer Goodman circled in blue)*

As the mob followed Officer Goodman up the staircase, they continued to make threatening

statements such as, "We're here for you," "Keep running, motherfucker," and "He's one person.

We're thousands." Government Trial Exhibit 504. At trial, Officer Goodman testified that he did

not recall seeing Hunter Seefried standing with the rioters while they were positioned at the base

of the staircase and did not attribute any of the statements he heard to Seefried at this point. Trial.

Tr. at 128, 06/13/2022.

Officer Goodman led Seefried and the rioters into the Ohio Clock Corridor. Trial. Tr. at

121-122, 06/13/2022. Seefried stood with rioters as they continued to harass Officer Goodman and

a line of USCP officers who responded to Officer Goodman's calls for assistance. Seefried intimidated officers by pacing back and forth with a clenched fist and a threatening demeanor, and refusing to leave when directed to do so.   *See* Government Trial Exhibit 414 at 0:55-11:20.

Several USCP officers testified at trial regarding their recollections of events that occurred in the Ohio Clock Corridor, including Seefried's conduct and demeanor. Officer Goodman testified that he heard rioters positioned near Seefried make threatening statements, such as: "We're ready for war"; "We're ready to take down this place"; "We're ready to take down this building"; "We're ready to take over." Trial. Tr. at 131, 06/13/2022. He also recalled statements made by Jacob Chansley—referred to at trial as "the shaman"—who was wearing face paint and a fur headdress with horns and carrying a blowhorn and a flag affixed to a spear. While Chansley and the other rioters faced off against police inside of the corridor, Chansley asked, "Where are the members at? Where are you all counting the votes at?" Trial. Tr. at 132-134, 06/13/2022. With respect to Seefried in particular, Officer Goodman recalled that, at one point, Seefried "appear[ed] to the front of the line, sort of [came] to the front of the line at one point." Trial. Tr. at 128, 06/13/2022. Officer Goodman told Seefried to leave, stating "you need to get out now," but Seefried told him "no." *Id.*

Officer Brian Morgan also testified regarding the tense and threatening situation that the officers faced while positioned inside of the Ohio Clock Corridor, to which Seefried contributed. Officer Morgan recalled that, while he did not have direct contact with Seefried, Seefried did attract his attention with the "nonverbals" that he was exhibiting, that is, indicators of a person's mental state other than their words, for example "the clenching of fists, their muscles tightening," or the "thousand yard stare." Trial. Tr. at 214-215, 06/13/2022. Officer Morgan observed that

Seefried, had his "fists clenched and [was] pacing back and forth a little bit." *Id*. Similarly, Sgt.

Brandon Kiely observed Seefried trying to engage with the police officers in the line. Trial. Tr. at

101-102, 06/14/2022.

The following screenshots from Government Trial Exhibit 414 capture Seefried in the Ohio

Clock Corridor.   As he entered the corridor, Seefried made his way to the front of the group of

rioters:



*Government Trial Exhibit 414 at 01:00 (2:16:01 p.m.)*

Seefried then crossed to the opposite side of the corridor, where his father was verbally

harassing Officer Goodman, pointing a water bottle at him. Seefried positioned himself at the

front of the group of rioters and turned his attention towards Officer Goodman and the officers

around him, as though challenging them.



*Government Trial Exhibit 414 at 01:05 (2:16:05 p.m.)*
*(Hunter Seefried circled in red; Officer Goodman circled in blue;*
*Kevin Seefried circled in yellow)*



*Government Trial Exhibit 414 at 01:12 (2:16:12 p.m.)*
*(Hunter Seefried circled in red; Officer Goodman circled in blue;*
*Kevin Seefried circled in yellow)*

As the crowd of yelling rioters advanced towards the officers, who repeatedly commanded

them to back up and to leave, Seefried appeared agitated. Still at the front of the crowd, he

advanced towards the retreating officers, moving his arms.



*See Government Trial Exhibit 414 at 1:20 (2:16:20 p.m.)*
*(Hunter Seefried circled in red)*

For the next twenty minutes, Seefried returned to the police line to engage with officers again and again.  *See, e.g.,* Government Trial Exhibit 414 at 03:07-03:30; *id.* at 07:00-07:15; *id.* at 16:15-16:45.



*Government Trial Exhibit 414 at 03:20 (2:18:19 p.m.)*



*Government Trial Exhibit 414 at 07:06 (2:22:07 p.m.)*



*Government Trial Exhibit 414 at 16:24 (2:31:25 p.m.)*

At trial, the government also introduced still photographs of Seefried while he engaged with officers in the corridor.



*Government Trial Exhibit 515*



*Government Trial Exhibit 510*



*Government Trial Exhibit 514*

Seefried and his father remained inside of the Capitol for twenty-five minutes before making their exit. In his interview with the FBI, Seefried indicated that he and his father left because he had heard that he and the other rioters would be tear gassed and arrested. *See* Government Trial Exhibit 301 at 28:25-28:56.

### *Seefried's Statement to the FBI*

Shortly after January 6, the FBI released "Be On the Lookout" or "BOLO" alerts for Kevin and Hunter Seefried. On January 11, 2021, having seen his picture in internet news articles, Kevin Seefried, through a third party, contacted the FBI so that he and Hunter Seefried could turn themselves in. Both Kevin and Hunter Seefried were interviewed the next morning by FBI agents. During his interview, Hunter Seefried described his family's travel from Delaware to Washington D.C. on the morning of January 6 to attend the "Stop the Steal" rally. He informed the interviewing agent that he stayed for the entire rally. He acknowledged that his motive for going to Washington

on January 6 was that he was concerned about "fraud" tied to the 2020 Presidential Election.

Seefried unequivocally admitted to entering the Capitol and acknowledged that it was wrong for him to have done so. He admitted seeing a USCP officer standing inside of the window—who Seefried believed was preparing to draw his gun—as he entered the window and conceded that he posed a threat to that officer. However, Seefried was adamant that he did not see *anyone* break a window prior to his entry into the Capitol building, an assertion that is squarely belied by the video evidence introduced at trial.

Consistent with the trial testimony of Officers Goodman, Morgan, and Kiely, Seefried admitted that he confronted a USCP officer about his concerns while inside the Capitol, demanding to know, "why this stuff is allowed to be happening in America." Seefried made it clear that by "stuff," he was referring to what he believed was fraud that prevented the re-election of then President Trump.

Seefried expressed remorse, stating that he should not have entered the Capitol to express his opinion in the manner in which he did.

## III.   THE CHARGES

On April 27, 2022, a federal grand jury returned a superseding indictment charging Hunter Seefried and Kevin Seefried with the following: Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count 1); Entering or Remaining in any Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count 2); Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2) (Count 3), Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 4); and Parading, Demonstrating, or Picketing in a Capitol

Building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 5). Hunter Seefried was also charged with Entering or Remaining in any Restricted Building or Grounds with Physical Violence Against Property, in violation of 18 U.S.C. § 1752(a)(4) (Count 6); Destruction of Government Property and Aiding and Abetting, in violation of 18 U.S.C. §§ 1361 and 2 (Count 7); and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count 8).

Seefried was convicted of Counts 1 through 5, and acquitted of Counts 6, 7, and 8.

## IV.    STATUTORY PENALTIES

Seefried now faces sentencing on the five counts of conviction. Seefried is subject to a combined maximum prison term of twenty-three years in custody (20 years for violation of 18 U.S.C. 1512(c)(2), a Class C felony; one year for each of the two Class A misdemeanors and six months for each of the two Class B misdemeanors); a term of probation of not more than five years for each of the two Class B misdemeanors pursuant to 18 U.S.C. § 3561(c); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2), for the Class C felony and one year for each of the two Class A misdemeanors; a fine of not more than a total of $460,000 ($250,000 for the Class C felony pursuant to 18 U.S.C. § 3571(b)(3) and (d), $100,000 for each of the two Class A misdemeanors pursuant to 18 U.S.C. § 3571(b)(5) and $5,000 for each of the two Class B misdemeanors pursuant to 18 U.S.C. § 3571(b)(6)); and special assessments totaling $170 ($100 for the Class C felony, $25 for each of the two class A misdemeanors pursuant to 18 U.S.C. § 3013(a)(1)(A)(iii), and $10 for each of the class B misdemeanor pursuant to 18 U.S.C. § 3013(a)(1)(A)(ii)).

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government concurs with the United States Probation Office that the Sentencing Guidelines offense level is 25 but disagrees with Probation about how that offense level is calculated. The Guidelines set out the specific "order" of the analysis: first, determine the offense guideline; second, determine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions; third, apply any adjustments in Parts A, B, and C of Chapter 3. U.S.S.G. § 1B1.1(a)(1)-(3). Then, repeat each step for each count. U.S.S.G. § 1B1.1(a)(4). Finally, perform the grouping analysis in Part D of Chapter 3. *Id.*

In the Pre-Sentence Investigation Report ("PSR"), the Probation Office did not employ this specified procedure in determine the total combined offense level. Rather, Probation started with the grouping analysis in Part D of Chapter 3, PSR ¶¶ 37-39, then did the Guidelines analysis in U.S.S.G. § 1B1.1(a)(1)-(3), but only for Count One, PSR ¶¶ 40-49. The appropriate offense level computations for Counts One, Two, and Three prior to any grouping analysis under Part D of Chapter 3, are as follows:

**Count One: 18 U.S.C. § 1512(c)(2)—obstruction of an official proceeding before Congress**

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Causing or Threatening to Cause Physical Injury to a Person, or Property Damage, in Order to Obstruct the Administration of Justice | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Substantial Interference with the Administration of Justice | +3 |
| | **Total** | **25** |

**Count Two: 18 U.S.C. § 1752(a)(1)—entering and remaining in a restricted building or grounds**

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Restricted Building or Grounds | +2 |
| U.S.S.G. § 2B2.3(c) | Cross Reference to U.S.S.G. § 2X1.1 | |
| U.S.S.G. § 2X1.1(a) | Base Offense Level for violation of 18 U.S.C. § 1512(c)(2), plus adjustments (U.S.S.G. § 2J1.2) | 25 |
| | **Total** | **25** |

**Count Three: 18 U.S.C. § 1752(a)(2)—Disorderly and Disruptive Conduct in a Restricted Building or Grounds**

| | | |
|---|---|---|
| U.S.S.G. §2A2.4(a) | Base Offense Level | 10 |
| | **Total** | **10** |

**Counts Four and Five: 40 U.S.C. § 5104(e)(2)(D) and (G)—Disorderly conduct in a Capitol building and parading, demonstrating, or picketing in a Capitol building**

Counts 4 and 5 are Class B misdemeanors to which the Sentencing Guidelines do not apply.

Counts One through Three group because all involve the same victim: Congress. U.S.S.G. § 3D1.2(d). The offense level for that Group is the level "for the most serious of the counts comprising the Group, *i.e.*, the highest offense level of the counts in the Group." U.S.S.G. § 3D1.3(a). Since Counts One and Two have the highest offense levels for any count in the group, the offense level for the group is 25. Although the Probation Office did not perform all of the foregoing calculations, it accurately concluded that the combined total offense level in this case is 25. PSR ¶ 49.

Seefried has no juvenile adjudications or adult criminal convictions. PSR ¶¶ 50, 51. The U.S. Probation Office calculated Seefried's criminal history as category I, which is not disputed. PSR ¶ 52. Accordingly, based on the government's calculation of the defendant's total offense level, at 25, Seefried's Guidelines imprisonment range is 57 to 71 months' imprisonment. PSR ¶ 94.

## A.  Enhancements Regarding the Administration of Justice Should Apply.

United States Sentencing Guidelines ("U.S.S.G.") § 2J1.2, which applies to "Obstruction of Justice" offenses, provides for an eight-level increase if the offense involved causing or threatening injury to a person or damage to property "in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B). It also provides for a three-level increase "if the offense resulted in substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2). Seefried has argued in his objections to the PSR that neither of these specific offense characteristics is applicable to his conduct in this case. He primarily asserts that his actions on January 6, 2021 did not relate to the "administration of justice," because they did not involve the interference with an investigation, evidence, or court resources.

28

Seefried fails to account for U.S.S.G. § 2J1.2's text and commentary. *See* U.S.S.G. § 1B1.1(b) ("The court shall then consider . . . any other policy statements or commentary in the guidelines that might warrant consideration in imposing sentence"). Section 2J1.2's commentary provides a broad definition of "administration of justice." It defines the term "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; or *the unnecessary expenditure of substantial governmental or court resources*." U.S.S.G. § 2J1.2 cmt. n.1 (emphasis added). This definition goes well beyond "a judicial or grand jury proceeding" to include the unnecessary expenditure of substantial "governmental" resources. *Id.* And because note 1 is part of the commentary of § 2J1.2 "that interprets or explains a guideline," it is "authoritative unless [the commentary] violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993). Here, the expenditure of government resources in an effort to quell the breach – including the deployment of the USCP, the Metropolitan Police Department ("MPD"), the National Guard, and various other state and federal law enforcement agencies – and to clean up and repair the damage done to the Capitol building and grounds by the rioters was certainly substantial. The government estimates that, as of October 13, 2022, the approximate total losses suffered as a result of the siege at the United States Capitol was $2,881,360.20.

In the context of cases arising out of the January 6, 2021 breach of the U.S. Capitol, several judges have applied at least one, and sometimes both, of the "administration of justice" enhancements. *See, e.g.*, *United States v. Duke Wilson*, No. 21-cr-345 (Lamberth, J.); *United States*

*v. Paul Hodgkins*, No. 21-cr-188 (Moss, J.); *United States v. Scott Fairlamb*, No. 21-cr-120 (Lamberth, J.); *United States v. Jacob Chansley*, No. 21-cr-003, (Lamberth, J.); *United States v. Matthew Miller*, No. 21-cr-075 (Moss, J.); *United States v. Gregory Rubenacker*, No. 21-cr-193 (Howell, C.J); *United States v. Guy Reffitt*, No. 21-cr-032 (Friedrich, J.). Probation therefore correctly rejected defendant Seefried's objections to the applicability of the "administration of justice" enhancements here. PSR at 25-26.

Other courts have applied U.S.S.G. § 2J1.2(b)(2) to other types of proceedings that would not fit Seefried's narrow definition of the "administration of justice." *See United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017) (upholding the application of § 2J1.2(b)(2) after law enforcement officials expended substantial resources to recover the defendant's children he kidnapped and transported internationally); *United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 205-08 (D.N.J. 2009) (applying § 2J1.2(b)(2) after a defendant interfered with OSHA investigations into a workplace accident); *United States v. Weissman*, 22 F. Supp. 2d 187, 194-98 (S.D.N.Y. 1998) (applying § 2J1.2(b)(2) after a defendant withheld subpoenaed documents from a congressional subcommittee); *United States v. Pegg*, 812 F. App'x 851, 860 (11th Cir. 2020) (upholding the application of § 2J1.2(b)(2) where defendant's "scheme and lies caused a substantial waste of resources, including hundreds of hours of work from the investigators") (citing *United States v. Johnson*, 485 F.3d 1264, 1271–72) (11th Cir. 2007)); *United States v. Meredith*, 602 F. App'x 102, 103 (4th Cir. 2015) (similar); *United States v. Tankersley*, 296 F.3d 620, 623–24 (7th Cir. 2002) (similar); *United States v. Harrington*, 82 F.3d 83, 87 n.2 (5th Cir. 1996), *as modified on reh'g* (Apr. 17, 1996) (similar); *United States v. Voss*, 82 F.3d 1521, 1532 (10th Cir. 1996) (same)).

**B. The Enhancement Regarding Injury or Property Damage Should Apply as a Factual Matter**

The Probation Office also correctly concluded that the enhancement pursuant to U.S.S.G. § J1.2(b)(1)(b) applies to defendant Seefried's conduct. PSR at ¶¶ 25-26. Seefried entered and remained in the United States Capitol for 25 minutes as part of a violent mob of people who chased Officer Goodman and damaged property—all while Congress was, by law, required to be engaged in a joint session to certify the Electoral College vote of the 2020 presidential election. This conduct resulted in "substantial interference with the administration of justice," because it contributed to the "unnecessary expenditure of substantial governmental . . . resources," warranting the enhancement under USSG § 2J1.2(b)(2). The violent and destructive manner in which Seefried substantially interfered with the administration of justice warrants additional punishment.

In *Rubenacker*, Chief Judge Howell rejected the defendant's challenge to the application of U.S.S.G. § 2J1.2(b)(1)(B) on the ground that his actions on January 6, 2021 did not cause or threaten physical injury to any person or damage any property. Rubenacker pleaded guilty to, *inter alia*, a violation of Section 1512(c)(2). The government presented evidence at sentencing that he also joined the mob that chased Officer Goodman up the staircase outside the Senate Chamber, that the defendant refused to leave the building when officers in the Ohio Clock Corridor tried to disperse the crowd, joined in a confrontation with officers in the Rotunda, and sprayed liquid from a plastic water bottle at an officer. See *United States v. Gregory Rubenacker*, 21-cr-193 (BAH), Sentencing Hearing Tr. 56:19-59:19.

Chief Judge Howell determined that all of Rubenacker's actions inside the Capitol on January 6 were relevant conduct under U.S.S.G. § 1B1.3 and that the totality of that conduct was

indeed threatening towards the many police officers protecting the Capitol and members of Congress on January 6. For that reason, she applied the enhancement under U.S.S.G. § 2J1.2(b)(1)(B). *See id*. 60:7-20.

Similarly here, all of Seefried's conduct described above, starting with his removing the glass shards from the broken exterior window, to leading other rioters in climbing through that window even while he was confronted by a police officer who pointed a pepper spray canister at him, to joining a mob of rioters who verbally accosted the officers inside the Capitol, to pursuing Officer Goodman, to refusing to leave the Ohio Clock Corridor as directed by the police, was threatening to the officers in the Capitol building. Unlike many of the January 6 defendants who passively walked through the Capitol building and never confronted officers or ignored their commands, Seefried's conduct on January 6 was sufficiently protracted, aggressive, and threatening to support the application of Section 2J1.2(b)(1)(B) enhancement.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In addition to the advisory Sentencing Guidelines, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of the government's recommended sentence of 64 months. That sentence is appropriate under § 3553(a) even if the Court does not apply the two enhancements discussed above.

32

### A.      Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While assessing Seefried's individual conduct, this Court should look to a number of critical factors. including: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this defendant's crimes weigh heavily towards a significant term of incarceration, in this case, 64 months. As noted extensively above, evidence at trial showed that Seefried climbed over a wall near a stairwell and scaffolding to gain access to the restricted Capitol building, that he watched and eventually joined rioters as they violently broke a window near the Senate Wing Door, despite the presence of a USCP officer on the other side, that he joined a mob of rioters as they verbally assaulted and chased Officer Goodman while he attempted to gain control of the rioters, that he intimidated officers inside of the Ohio Clock Corridor, and that he refused to leave the Capitol when directed to do so. This conduct underscored Seefried's determination to obstruct the certification proceeding. Seefried's conduct demands a lengthy sentence of imprisonment.

### B.  The History and Characteristics of the Defendant

Seefried is 24 years old and resides in Laurel, Delaware. PSR ¶ 59. With the exception of traffic violations, Seefried has no juvenile adjudications or criminal convictions. PSR ¶¶ 53, 54.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Seefried's criminal conduct in corruptly

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                                      at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

obstructing an official proceeding, is the epitome of disrespect for the law.

Seefried personally observed rioters aggressively and violently entering the Capitol using a 2x4 and a police shield to break into the Capitol. He also engaged with numerous officers who were commanding him and other rioters to leave the Capitol. The rule of law was not only disrespected; it was under attack that day. Seefried played a direct role in this disrespect and disregard of the law. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to

---

[4] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

Unlike many January 6 defendants, the government is not aware of any social media posts (or statements other than his FBI interview) by Seefried regarding his actions that day. Nevertheless, it is clear that, when faced with a political outcome with which he disagreed, Seefried chose to go beyond discourse or protest.

It is notable that, days after his attack of the Capitol, Seefried turned himself in to the FBI

and expressed remorse for his entry into the Capitol building during his interview. However, it is worth considering that Seefried turned himself in after the FBI had made him the subject of a BOLO and after family members notified his father and co-defendant that he, Kevin Seefried, was photographed inside of the Capitol. Hunter Seefried's show of remorse came only when Seefried, faced with overwhelming evidence of his guilt, had no choice but to confess that he breached the Capitol on January 6. Even then, he struggled to fully admit to what occurred that day, disclaiming any knowledge of how the window through which he entered the Capitol had been broken. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

###    E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with

appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

F.        **Unwarranted Sentencing Disparities**

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

Relatively few Capitol Riot cases involving the lead charge here—18 U.S.C. § 1512(c)(2)—have proceeded to sentencing. And most of those sentencings have followed from guilty pleas rather than trial convictions. As of the date of this sentencing memorandum, several Capitol Riot defendants have been sentenced for § 1512(c)(2) convictions that did not also involve convictions for assault or property damage, which provide helpful reference points:

One of those is *United States v. Paul Hodgkins*, 21-cr-188 (RDM). Hodgkins unlawfully entered the U.S. Capitol and made it to the Senate Floor with a Trump flag, where he walked among senators' desks, took selfie-style photographs, and raised his flag in salute to other rioters in the Senate well. Hodgkins did not engage in any acts of intimidation or violence and did not destroy any property. He was the first felony Capitol Riot defendant and first defendant charged with a violation of Section 1512(c)(2) defendant to proceed to sentencing. In that case, consistent with the parties' plea agreement, the Court determined that the defendant's total offense level was 14 and his criminal history category was I, resulting in a Guidelines range of 15 to 21 months' imprisonment. The Court applied the three-point enhancement pursuant to U.S.S.G. § 2J1.2(b)(2), but the Government did not seek, and the Court did not apply, the eight-point enhancement pursuant to U.S.S.G. § 2J1.2(b)(1)(B). Hodgkins also received a three-point reduction pursuant to

U.S.S.G. § 3E1.1. The Government recommended a sentence of 18 months' imprisonment. The Court imposed an 8-month sentence, varying downward by 7 months because Hodgkins had "no criminal record of any type," he entered an early plea, he did not threaten or engage in acts of violence or encourage acts of violence, and he took "significant steps towards his rehabilitation" while on pretrial release.

In *United States v. Jacob Chansley*, 21-cr-003 (RCL), the defendant, like Seefried, was in the first wave of rioters to enter the Capitol through the Senate Wing door and spent a significant period of time engaging with the line of police officers in the Ohio Clock Corridor, including using threatening language. Unlike Seefried, Chansley made it to the Senate floor and left a threatening note for then-Vice President Mike Pence on the Senate dais. Also, following the riot, Chansley gave interviews to media outlets in which he gloated and said he considered January 6th "a win." In that case, consistent with the parties' plea agreement, the Court determined that the defendant's total offense level was 22 and his criminal history category was I, resulting in a Guidelines range of 41 to 51 months' imprisonment. The Court applied both the eight-point enhancement pursuant to U.S.S.G. § 2J1.2(b)(1)(B) and the three-point enhancement pursuant to U.S.S.G. § 2J1.2(b)(2). Chansley also received a three-point reduction pursuant to U.S.S.G. § 3E1.1. The Government recommended a sentence of 51 months' imprisonment. The Court imposed a 41-month sentence, citing, among other factors, Chansley's genuine remorse.

In *United States v. Joshua Pruitt*, 21-cr-023 (TJK), the defendant had begun his initiation into the Proud Boys several weeks prior to January 6, 2021, engaged in extensive preparations for that day, and expressed his readiness for violence, including sending pictures of himself posing with weapons with accompanying text such as "Ready for the 6th." On January 6, Pruitt initially walked around the police line on the northwest lawn in a threatening manner, then joined other

rioters after the police line on the northwest stairs was breached (the same path taken by Seefried and his father). Pruitt entered the Capitol via the Senate Wing Doors at approximately 2:13 p.m., less than a minute after Seefried. Once inside, he traveled to various locations, threw a wooden sign and a chair, and engaged in what USCP officers in the area referred to as "pre-assault indicators"—pointing his finger at officers, taunting them, and taking a fighting stance. He also encountered Senator Schumer and his security detail attempting to evacuate and sped towards them, causing the offices in the detail to rush the Senator away from Pruitt. In the days following January 6, Pruitt continued to post threatening messages on social media and gave interviews in which he denied wrongdoing. In that case, consistent with the parties' plea agreement, the Court determined that the defendant's total offense level was 22 and his criminal history category was III, resulting in a Guidelines range of 51 to 63 months' imprisonment. The Court applied both the eight-point enhancement pursuant to U.S.S.G. § 2J1.2(b)(1)(B) and the three-point enhancement pursuant to U.S.S.G. § 2J1.2(b)(2). Pruitt also received a three-point reduction pursuant to U.S.S.G. § 3E1.1. Without this reduction, Pruitt's Guidelines range would have been 70-87 months. The Government recommended a sentence of 60 months' imprisonment. The Court imposed a 55-month sentence.

In *United States v. Richard Michetti*, 21-cr-232 (CRC), the defendant entered the Capitol building at approximately 2:35 p.m. via a door on the Upper West Terrace of the building, only two minutes after that door had been breached. Approximately 25 to 30 minutes before entering, he texted another individual, "Gotta stop the vote it's fraud this is our country." Once inside, he went to various locations and joined a mob of rioters trying to force their way past a line of MPD officers from the Rotunda to the Old Senate Chamber, yelled and gestured at the officers, and

briefly pinched one officer's jacket. In that case, consistent with the parties' plea agreement, the Court determined that the defendant's total offense level was 14 and criminal history category was I, resulting in a Guidelines range of 15 to 21 months' imprisonment. The Court applied the three-point enhancement pursuant to U.S.S.G. § 2J1.2(b)(2), but the Government did not seek, and the Court did not apply, the eight-point enhancement pursuant to § U.S.S.G. § 2J1.2(b)(1)(B). Michetti also received a three-point reduction pursuant to U.S.S.G. § 3E1.1. The Government recommended a sentence of 18 months' imprisonment. The Court imposed a 9-month sentence, varying downwards on the grounds that Michetti lacked any notable criminal history, was the sole caretaker of his four-year-old child, and had taken rehabilitative steps such as taking anger management classes while on pretrial release.

In *United States v. Anthony Williams*, 21-cr-377 (BAH), the defendant joined a group of rioters on the West Front where he helped them climb bicycle racks that were repurposed by the rioters as ladders to climb the foundational walls of the Capitol building to flank and overrun the police on the Northwest stairs. Williams recorded himself on those stairs and bragged, "[w]e just stormed the stairs of the Capitol, pushed the cops back and were maced and pepper-sprayed, and hit everybody. Fuck that, we took this fucking building." He then stole water bottles that USCP officers had stored on the Upper West Terrace of the Capitol building to be used for decontamination if USCP officers were hit with chemical irritants.

Williams, like Seefried, was one of the first rioters to enter the Capitol and did so via the Senate Wing doors only 6 minutes after the doors were initially breached. While inside the Capitol, Williams overran the police in the Crypt with other rioters. Williams advanced to the Rotunda where he celebrated with other rioters and smoked marijuana. When the police tried to force

Williams out of the Rotunda, he joined with other rioters and actively resisted and mocked the police. Williams followed his rioting at the Capitol by bragging on social media about his actions, expressing no remorse, and proclaiming that January 6 was the proudest day of his life. In that case, following Williams's conviction at trial, the Government and Probation both calculated the defendant's total offense level as 25 and criminal history category as I,[5] resulting in a Guidelines range of 57 to 71 months' imprisonment. The Court applied both the eight-point enhancement pursuant to U.S.S.G. § 2J1.2(b)(1)(B) and the three-point enhancement pursuant to U.S.S.G. § 2J1.2(b)(2). The Government recommended a sentence of 64 months' imprisonment. The Court imposed a 60-month sentence.

This Court is well-versed in the case of *United States v. Timothy Hale-Cusanelli*, 21-cr-32 (TNM), in which the defendant entered the Capitol as a result of the initial breach of the Senate Wing Door at approximately 2:14 p.m., approximately one minute after Seefried. After entering, Hale-Cusanelli entered the Capitol Crypt and the Capitol Visitor's Center (CVC) where he and other rioters overwhelmed officers attempting to keep the rioters from making entry. After successfully aiding the effort to thwart the officers' attempts to manage the growing crowd of rioters, including by interfering in the arrest of a fellow rioter, Hale-Cusanelli made his way back to the Senate Wing Door and eventually climbed out a window to exit the building. In that case, following Hale-Cusanelli's conviction at trial, the Government and Probation both calculated the defendant's total offense level as 27 and criminal history level as I, resulting in a Guidelines range

---

[5] Williams had an extensive criminal history, with 8 adult criminal convictions and 3 juvenile adjudications. Nevertheless, because of the advanced age and/or minor nature of his convictions, his criminal history category was I.

of 70 to 87 months' imprisonment. As noted above, this Court declined to apply the enhancements under U.S.S.G. § 2J1.2(b)(1)(B) and (b)(2) and determined that the defendant's total offense level was 16[6] and criminal history category was I, resulting in a Guidelines range of 21 to 27 months' imprisonment. The Government recommended a sentence of 78 months' imprisonment. The Court imposed a 48-month sentence, citing the defendant's taunting of police officers, "deep hostility" and degrading statements towards racial and religious minorities that reflected his motivation to obstruct the Congressional certification of the electoral college vote count on January 6, and untruthful testimony as aggravating factors.

As with all criminal defendants, Seefried shares many similarities with those convicted of the same offense. His conduct is also distinguishable from theirs. Like many of the defendants discussed above, Seefried was part of the initial breach of the Senate Wing Doors at 2:12 p.m. But Seefried was the very tip of the spear, clearing the way for others to enter, and was the fourth rioter to set foot in the building at that breach point. To be sure, Seefried himself did not lay a hand on a police officer, nor were any of the threats and taunts shouted by the mob attributed directly to him. But he strove to be at the front of the pack and placed himself where the "commotion" was on numerous occasions, his presence and demeanor posing a threat to the officers he encountered. And, while Seefried did not brag on social media or in interviews about his participation in the breach of the Capitol, he has not accepted responsibility either. Many of the defendants discussed above pleaded guilty, some of them quite early on in the investigation. In contrast, Seefried could not admit to the FBI that he had observed others' criminal conduct in breaking through the

---

[6] Hale-Cusanelli also received a two-point enhancement pursuant to U.S.S.G. § 3C1.1 due to his untruthful testimony at trial.

windows adjacent to the Senate Wing Doors.

This Court should impose sentence at the mid-range of the Guidelines as calculated by the Probation Office in this case. As shown by the foregoing discussion of other Section 1512(c)(2) cases, such a sentence would not create an unwarranted disparity. So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017).

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[7] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Applying these principles to this case leads to the conclusion that Seefried should be required to pay $2,000 in restitution. One of the offenses for which he was found guilty, 18 U.S.C. § 1752(a)(1), triggers mandatory restitution under the MVRA as an "offense against property" that resulted in pecuniary loss for the Architect of the Capitol, *see* 18 U.S.C. § 3663A(c)(1)(A)(ii). Moreover, Seefried's additional convictions under Title 18, *see* Count 1 (18 U.S.C. § 1512(c)(2)); Count 3 (18 U.S.C. § 1752(a)(2)), fall within the VWPA. As of October 13, 2022, several victims in this case, including the Architect of the Capitol, the Officer of the Chief Administrative Officer of the United States House of Representatives, and the Officer of the Secretary of the United States Senate, estimated approximate losses from the siege at the United States Capitol at $2,881,360,20. Attached as Exhibits A, B, and C are letters from representatives of the Architect of the Capitol, the Office of the Chief Administrative Officer of the United States House of Representatives, and the Office of the Secretary of the United States Senate, attesting to the pecuniary damages each suffered as a result of the attach on the Capitol on January 6, 2021: $1,717,254.03, $547,411.27, and $32,075.00, respectively. Those amounts do not account for the damages suffered by the USCP, MPD, or myriad other law enforcement agencies.[8] January 6 defendants who have pled guilty to one or more felony offenses have uniformly agreed to pay $2,000 in restitution. *See, e.g. United States v. Cody Mattice and James Mault*, D.D.C., 1:21-cr-00657 (BAH), ECF 43 and 47

---

[8] The Government estimates that, as of October 13, 2022, the approximate total losses suffered as a result of the siege of the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and losses suffered by law enforcement officers deployed to protect Members of Congress, their staff, and other Capitol.

(plea agreements). Recognizing the practical and legal difficulties in allocating loss amounts across all January 6 defendants, including many who will be charged in the future, judges of this Court have likewise imposed restitution in the amount of $2000 on defendants convicted of one or more felonies following trial. *See, e.g., United States v. Hale-Cusanelli* (TNM), 21-cr-037 ECF 118 (judgment). This Court should do likewise and order Seefried to pay $2,000 in restitution in this case.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 64 months, which is a mid-range sentence as calculated by the government and as agreed upon by the parties in the plea agreement, restitution of $2,000, and the mandatory $170 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:      */s/ Brittany L. Reed*
BRITTANY L. REED
Assistant United States Attorney
LA Bar No. 31299
650 Poydras Street, Ste. 1600
New Orleans, LA 70130
Brittany.Reed2@usdoj.gov
(504) 680-3031

*/s/ Benet J. Kearney*
BENET J. KEARNEY
Assistant United States Attorney
NY Bar No. 4774048
1 Saint Andrew's Plaza
New York, New York 10007
BKearney@usa.doj.gov
(212) 637-2260