**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** v. **HUNTER SEEFRIED**, Defendant. | Case No. 21-cr-287 (TNM) |

## MEMORANDUM OPINION

Did the electoral certification on January 6, 2021, involve the "administration of justice"? The answer determines whether significant sentencing enhancements may apply to convictions under 18 U.S.C. § 1512(c) for obstruction of an official proceeding.  In the Court's view, the answer is no.  Text, context, and precedent show that the "administration of justice" most naturally refers to a judicial or related proceeding that determines rights or obligations.  The electoral certification was not such a proceeding.

## I.

This Court found Hunter Seefried guilty of obstructing an official proceeding—the electoral certification—under § 1512(c), along with four other counts.  *See* Presentence Investigation Report (PSR) ¶ 9; *see also* Tr. of Bench Trial Verdict, ECF No. 109.  Hunter Seefried was a 22-year-old forklift technician when he came to Washington on January 6.  *See* PSR ¶ 76; *see also* Def.'s Mem. in Aid of Sentencing at 15, ECF No. 114.  He watched as other protestors used a police riot shield and a wooden beam to shatter the Capitol's large windows. *See* PSR ¶ 19.  He then cleared glass from a window and clambered through it, followed by other protestors.  *See id.* ¶¶ 19–20.  Once inside the Capitol building, Seefried joined other protestors in confronting U.S. Capitol police and even chasing an officer through the Senate corridors.  *See*

*id.* ¶ 21.  Seefried's fellow rioters searched for Members of Congress and the location of the

certification proceeding.  *See id.* ¶ 22.

**II.**

Section 1512(c)(2) provides that "whoever corruptly . . . obstructs, influences, or impedes

any official proceeding, or attempts to do so" faces a fine or up to 20 years imprisonment.  18

U.S.C. § 1512(c)(2).  The Government has charged many defendants in the January 6 cases with

violating this statute.  *See, e.g.*, *United States v. Hale-Cusanelli*, No. 21-cr-37, Superseding

Indictment, ECF No. 59; *United States v. Reffitt*, No. 21-cr-32, Second Superseding Indictment,

ECF No. 34; *United States v. Rubenacker*, No. 21-cr-193, Superseding Indictment, ECF No. 33.

The "official proceeding" at issue in these cases is the certification of electoral votes.

During this proceeding, the "certificates and papers purporting to be certificates of the electoral

votes . . . [are] opened, presented, and acted upon in the alphabetical order of the States."  3

U.S.C. § 15.  Then, tellers "make a list of the votes as they [] appear" and "the result . . . [is]

delivered to the President of the Senate," who announces the outcome of the election.  *Id.*

Finally, a list of the votes is entered in the House and Senate journals.  *See id.*  This Court has

held—along with most other judges in this district—that the certification qualifies as an "official

proceeding" under § 1512(c).  *See, e.g.*, *United States v. Hale-Cusanelli*, 2022 WL 4300000, at

*1 (D.D.C. Sept. 19, 2022).

But does the electoral certification also involve the "administration of justice"?  That is a

thornier question.  For defendants convicted under § 1512(c), the Government has argued that

sentencing enhancements for obstructing or interfering with "the administration of justice"

should apply.  U.S.S.G. §§ 2J1.2(b)(1)(B), (b)(2).  One provision triggers an eight-level

enhancement "[i]f the offense involved causing or threatening to cause physical injury to a

2

person, or property damage, in order to obstruct the administration of justice." *Id.*

§ 2J1.2(b)(1)(B). And another prompts a three-level enhancement "[i]f the offense resulted in

substantial interference with the administration of justice." *Id.* § 2J1.2(b)(2).

For Seefried, this is not an academic question. If these enhancements apply, his

sentencing guideline level is 25, with a recommended sentence of 57–71 months; if they do not,

his level is 14, with a recommended sentence of 15–21 months. The Court finds that the

enhancements in §§ 2J1.2(b)(1)(B) and (b)(2) do not apply because the electoral certification

does not involve the "administration of justice."

### III.

In interpreting the Sentencing Guidelines, the Court applies the ordinary tools of statutory

interpretation and looks to the plain meaning of its terms. Many circuits agree. *See, e.g.*, *United

States v. Savin,* 349 F.3d 27, 35–36 (2d Cir. 2003); *United States v. Peterson*, 629 F.3d 432, 434

(4th Cir. 2011); *United States v. Bustillos-Pena*, 612 F.3d 863, 868 (5th Cir. 2010); *United States

v. Bahhur*, 200 F.3d 917, 927 (6th Cir. 2000); *United States v. Smith*, 989 F.3d 575, 586 (7th Cir.

2021); *United States v. Collins*, 754 F.3d 626, 630 (8th Cir. 2014); *United States v. Kirilyuk*, 29

F.4th 1128, 1137 (9th Cir. 2022).

To discern the text's plain meaning, courts look to dictionary definitions and analyze the

word or phrase in context. *See, e.g.*, *Kaufman v. Nielsen*, 896 F.3d 475, 485–87 (D.C. Cir.

2018). The relevant context for a sentencing guideline may include the commentary. *See, e.g.*,

*Kirilyuk*, 29 F.4th at 1137–39. Finally, the Court looks to precedent to analyze how other courts

have interpreted this phrase or similar phrases.

### A.

First, text. Black's Law Dictionary defines the phrase "administration of justice" as

"[t]he maintenance of right within a political community by means of the physical force of the state" and "the state's application of the sanction of force to the rule of right." *Administration of Justice*, Black's Law Dictionary (11th ed. 2019). Similarly, "due administration of justice" is defined as "[t]he proper functioning and integrity of a court or other tribunal and the proceedings before it in accordance with the rights guaranteed to the parties." *Id*. Although the Guideline only contains the phrase "administration of justice," not "due administration of justice," the Government has given the Court no reason to believe these are not closely associated phrases. These definitions suggest that the "administration of justice" involves a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights.

The certification does not share the characteristics of these definitions. The best evidence for what actually occurs during the certification is the statute proscribing its procedures. *See* 3 U.S.C. § 15. During the proceeding, "certificates and papers purporting to be certificates of the electoral votes . . . [are] opened, presented, and acted upon in the alphabetical order of the States." *Id*. Then, tellers "make a list of the votes as they . . . appear" and deliver the result to the President of the Senate after Members resolve any objections. *Id*. Finally, the votes are entered in the House and Senate journals. *See id*.

The certification is thus largely a ceremonial proceeding where Members and staff open, read, list, and announce the electoral votes. *See id*. It takes place within the deliberative branch of government—Congress—not the branches that typically exercise judgment (the judiciary), or force (the executive). *See generally* The Federalist No. 78 (Alexander Hamilton). Congress applies no "physical force" or "sanction of force" during the certification. And the proceeding involves no possibility of punishment by the state, as a judicial, investigatory, or enforcement proceeding might to "maint[ain] [] right within a political community." Nor does the

4

certification involve the "proper functioning and integrity of a court or other tribunal . . . in accordance with the rights guaranteed to the parties."  These definitions evoke traditional judicial or quasi-judicial bodies that decide or maintain the legal rights of the parties before them.  In contrast, the certification confirms, announces, and officially records whom the people have chosen to be President and Vice President.  *See* 3 U.S.C. § 15.  In other words, it commemorates and completes the peaceful transfer of executive authority.

Consider another relevant definition.  Black's Law Dictionary defines "obstructing the administration of justice" and "interfering with the administration of justice" as "[t]he skewing of the disposition of legal proceedings, as by fabricating or destroying evidence, witness-tampering, or threatening or intimidating a judge."  *Perverting the Course of Justice*, Black's Law Dictionary (11th ed. 2019) (cross-referencing these phrases).  This definition is probative because § 2J1.2 uses the terms "obstruct" and "interference" when discussing what a defendant might impermissibly *do* to the "administration of justice."

This definition further corroborates that the "administration of justice" involves something like a legal proceeding, such as a trial or grand jury hearing.  Obstruction or interference with such a proceeding occurs through action that could "skew . . . the disposition." The definition suggests that possible actions include falsifying or destroying evidence, tampering with witnesses, or threatening a judge.  The certification does not resemble a trial or similar judicial proceeding where evidence could be falsified or destroyed, witnesses could be tampered with, or a judge could be intimidated so as to interfere with the disposition of parties' legal rights.

Indeed, the Government could have charged Seefried with violating § 1503, a different provision in the same statute that defines "obstruction of justice" as an act that "corruptly or by

threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the *due administration of justice*."  18 U.S.C. § 1503 (emphasis added).  But to the Court's knowledge, none of the January 6 defendants have been charged under § 1503.  Though the Court hesitates to derive meaning from exercises of prosecutorial discretion, the existence of similar language elsewhere with a clear relationship to the enhancements in § 2J1.2 is curious.  The official proceeding statute under which this Court convicted Seefried contains no such language.  *See* 18 U.S.C. § 1512.

To be sure, some courts have recently interpreted the "administration of justice" in § 2J1.2 more broadly.  In *United States v. Miller*, another judge in this district defined the individual words in the phrase by looking to Webster's Third New International Dictionary.  *See* 21-cr-75, Tr. at 16 (May 23, 2022), ECF No. 73.  The court explained that "administration in this sense means to mete out, and justice means fair treatment."  *Id.*  The court reasoned that these definitions are broad enough to encompass the certification because Congress was "adjudicating in some . . . limited sense, subject to very substantial constraints, the results of the election."  *Id.*

But this Court hesitates to slice and dice a term of art.  "Adhering to the *fair meaning* of the text (the textualist's touchstone) does not limit one to the hyperliteral meaning of each word in the text . . . .  The full body of a text contains implications that can alter the literal meaning of individual words."  Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 356 (2012) (Scalia & Garner); *see also Bostock v. Clayton County*, 140 S. Ct. 1731, 1825 (2020) (Kavanaugh, J., dissenting) ("[C]ourts must adhere to the ordinary meaning of phrases, not just the meaning of the words in a phrase."); William Eskridge, *Interpreting Law* 62 (2016) (noting that judges should follow ordinary meaning "when two words combine to produce a meaning that is not the mechanical composition of the two words separately").

And even if segmenting the terms of the phrase were appropriate, another legal dictionary supports this Court's reading. Ballentine's Law Dictionary defines "administration" as the "execution of a law by putting it in effect, applying it to the affairs of men." *Administration*, Ballentine's Law Dictionary (3d ed. 1969). And it defines "justice" as "[t]hat end which ought to be reached in a case by the regular administration of the principles of law involved as applied to the facts." *Justice*, Ballentine's Law Dictionary (3d ed. 1969). Even separating the words supports the reading that the "administration of justice," as a legal term of art, refers to state action vis-à-vis legal rights.

In *United States v. Rubenacker*, another judge in this district interpreted the administration of justice broadly to apply § 2J1.2's enhancements to a January 6 defendant convicted under § 1512(c). *See United States v. Rubenacker*, 21-cr-193, Tr. at 71–72 (May 26, 2022), ECF No. 70. In *Rubenacker*, the court reasoned that the Black's Law Dictionary definition of "administration of justice" suggests "that the state would use mechanisms, such as the police or prosecutors, to force compliance with or maintain a right; that is not necessarily tied to a court or a particular tribunal." *Id.* at 72. The court explained that "the physical force of the state" was present during the certification "in the form of law enforcement officers located in and around the Capitol to secure the proceedings." *Id.* at 75. And it suggested that legislators' statutory right to object during the certification "can be analogized to evidentiary objections." *Id.* at 66.

This Court is unconvinced. The fact that law enforcement is present at an official proceeding—which will often be the case—surely cannot mean that the administration of justice is occurring. Consider a presidential inauguration. Police and Secret Service are present at this official proceeding to protect the incoming President and other distinguished attendees. But no

one would say that the inauguration involves the "administration of justice"; it is a ceremonial proceeding that formally installs the Nation's new leader.

The definitions of the "administration of justice" discussed above suggest that a judicial or quasi-judicial body must itself be applying the force of the state to decide legal rights, not that force need merely be present. The *Rubenacker* court's other argument—that legislators have the right to object to the certification—also does not mean that the certification involves the administration of justice. Simply because Members may debate whether a certified vote is proper, and rules exist for resolving objections, does not mean they are administering justice. Indeed, if this were the case, it is hard to imagine a congressional proceeding that would not qualify, given that the legislative process often involves these same characteristics.

Admittedly, the dictionary definitions here are a bit unwieldy. Dictionary definitions are valuable because they are evidence of how ordinary speakers of language understand words and how legal interpreters understand terms of art. But dictionaries do not end the inquiry. This is so because not all "meanings appropriate to particular contexts are to be found in the dictionary." Scalia & Garner at 70.

A reader therefore must look to context to determine "which of several possible senses a word or phrase bears." *Id.*; *accord Bostock*, 140 S. Ct. at 1827 (Kavanaugh, J., dissenting) ("If the usual evidence indicates that a statutory phrase bears an ordinary meaning different from the literal strung-together definitions of the individual words in the phrase, we may not ignore or gloss over that discrepancy. Legislation cannot sensibly be interpreted by stringing together dictionary synonyms of each word." (cleaned up)); *see also id.* at 1766 (Alito, J., dissenting) ("[T]he meaning of language depends on the way a linguistic community uses words and phrases in context."). So the Court looks to both the context in which the "administration of justice"

most often appears and the immediate context found in the commentary to § 2J1.2.

**B.**

The Court undertakes two analyses to understand how the "administration of justice" is properly understood in context. The first uses a methodology called "corpus linguistics" to assess the customary usage of the phrase at the time the Sentencing Commission crafted the Guidelines. The second looks to § 2J1.2's commentary, which the Court finds helpful but not dispositive.

**1.**

Although dictionaries provide a useful starting point, "[b]ecause common words typically have more than one meaning, you must use the context in which a given word appears to determine its aptest, most likely sense." Scalia & Garner at 418; *see generally* Stephen C. Mouritsen, *The Dictionary is Not a Fortress: Definitional Fallacies and a Corpus-Based Approach to Plain Meaning*, 2010 B.Y.U. L. Rev. 1915 (2010) (describing the shortcomings of collecting dictionary definitions and advocating for a broader, corpus-based approach to linguistic meaning). To understand what meaning the Guideline most naturally evokes, the Court also looks to customary usage at the time.

Courts may assess the customary usage of a phrase by searching relevant databases of naturally occurring language. This method is known as corpus linguistics. "Corpus linguistics is an empirical approach to the study of language that uses large, electronic databases" of language gathered from sources. Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 Yale L. J. 788, 828 (2018); *see also* Lawrence B. Solum, *Triangulating Public Meaning: Corpus Linguistics, Immersion, and the Constitutional Record*, 2017 B.Y.U. L. Rev. 1621, 1643–49 (2017) (explaining why the method helps clarify linguistic meaning).

9

Other courts have deployed corpus-based approaches to textual meaning.  For example, Justice Breyer, writing for the Court, adopted a corpus-based approach to illuminate the meaning of the phrase "carries a firearm."  *See Muscarello v. United States*, 524 U.S. 125, 128–31 (1998) (recounting the phrase in context from dictionaries, literature, and newspaper articles found in computerized databases).  Other courts have also conducted corpus-based analyses using publicly available databases.  *See, e.g.*, *Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 439 (6th Cir. 2019) (Thapar, J., concurring in part and concurring in the judgment); *United States v. Rice*, 36 F.4th 578, 583 n.6 (4th Cir. 2022); *Health Freedom Def. Fund, Inc. v. Biden*, No. 8:21-cv-1693, --- F. Supp. 3d ---, 2022 WL 1134138, at *7 (M.D. Fla. Apr. 18, 2022).

Because various publicly-available databases of language exist, *see, e.g.*, https://www.english-corpora.org/; lncl8.lawcorpus.byu.edu, courts must choose a corpus carefully.  The database searched should include texts from the relevant linguistic community that would read and understand the text at issue.  *Cf.* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 536 (1947) (explaining that texts "addressed to specialists, [] must be read by judges with the minds of the specialists"); James A. Heilpern, *Dialects of Art: A Corpus-Based Approach to Technical Terms*, 58 Jurimetrics J. 377, 389–97 (2018) (explaining the promise of a corpus-based approach for terms of art).

The primary linguistic community using and understanding the Sentencing Guidelines is an informed legal audience—most notably, lawyers and judges.  Unlike most statutes, which are at least theoretically intended to be read and understood by citizens, the Guidelines are a practitioner's guide to federal sentencing.  The Court therefore focused on the Corpus of

Caselaw Access Project (COCAP), which compiles the text of federal and state court decisions. *See* https://lncl8.lawcorpus.byu.edu/.[1]

But just in case one thinks the Guidelines should be read like criminal statutes—directed to the general public—the Court also searched the Corpus of Historical American English (COHA), which collects sources across genres, including fiction, magazines, newspapers, and academic articles. *Cf. Rice*, 36 F.4th at 583 n.6 (looking to a database collecting "documents an ordinary speaker of English would interact with regularly" when interpreting a criminal statute). At the very least, it would be notable if these corpora produced wildly different results. As it turns out, they did not.

The Court queried the COCAP for the years 1977–1987. This period represents the decade before and including the year in which the Commission promulgated § 2J1.2. *See* U.S.S.G. § 2J1.2 (effective Nov. 1, 1987). *Cf. Safelite*, 930 F.3d at 444 (Thapar, J., concurring in part and concurring in the judgment) (looking to a ten-year period to generate a sample of written text around the time Congress first passed the relevant language). This search returned 14,118 hits, or "concordance lines." Given such a large universe, the Court reviewed a random sample of 375 concordance lines containing the phrase "administration of justice" to see what sorts of official proceedings were discussed. This sample size produces a 95% confidence interval. A random sample can be generated through the database itself by filtering for a specific number of results.

The most frequent usage of the "administration of justice"—about 65% of the total hits—corresponds with the sense described above: a judicial proceeding deciding legal rights. The

---

[1] The Court has collected and coded the hits from the databases it queried into a spreadsheet appended as Attachment A.

phrase appeared in conjunction with witness tampering, contempt of court, various evidentiary privileges, the effect of jury instructions on court proceedings, and the conduct of juries.  The phrase also accompanies issues of judicial management, including delays in court proceedings, repeat litigants, and even courtroom dress code.  Other hits dealt with media access to judicial proceedings.  Finally, some hits reflected more general concerns about retroactivity and the "fair," "proper," "effective," or "thorough" administration of justice by courts.

The next most common context in which the "administration of justice" appeared— around 25% of hits—involved disciplining judges or lawyers for conduct that interfered with judicial proceedings.  Some hits referenced violations of various ethical rules, contempt of court, recusal, disqualification of counsel, and perjury when a lawyer testified before a grand jury.  Again, the customary usage of the phrase was closely linked with judicial proceedings, or an actor who is intimately involved with the judicial process.

Another category of note—about 4% of hits—involved law enforcement activities.  Some hits referenced conduct such as resisting arrest.  Others discussed the need for anonymous informants to promote cooperation with law enforcement, the rationale for the exclusionary rule, and prosecutorial discretion.  One discussed setting standards for roadside intoxication tests.  These hits differed from those described above in that they did not always involve a formal proceeding or a judicial body.  But they all contemplate the state's application of force or the government's role in investigating and prosecuting crimes.[2]

---

[2]  The Court identified a few other categories, all of which had only a few hits.  These referred to grand juries, bar associations, and two committees (one Congressional and the other Presidential) that have the phrase "administration of justice" in their title.  The Court also coded a few entries as "unclear" if the context in the concordance line did not provide enough information to categorize the entry.

In contrast, the least common usage of "administration of justice" was as a broad term referring to government function generally.  The Court identified three such entries out of the 375 it coded.  One dealt with a public utility commission that discussed the administration of justice in broad terms.  Another noted that local commissioners' power to issue licenses involves the administration of justice.  And another suggested that Texas counties are involved in the administration of justice.  No entries discussed a Congressional proceeding.

This is not to say that because the administration of justice most often appeared in the context of a judicial proceeding means that it takes on that meaning in all contexts.  And of course, the certification of electoral votes *could* involve the administration of justice, despite not appearing in this sample.  But the vast majority of examples in the sample shared certain hallmarks such as action disruptive of, or prejudicial to, a court proceeding; discipline of judges and lawyers; and conduct that would disrupt or aid law enforcement investigations.  The certification does not share these characteristics.

Even if the proper linguistic community is not lawyers and judges, a review of a broader set of sources does nothing to undermine the Court's findings.  Querying COHA for the same time period returned 12 results for "administration of justice."  Though the Court hesitates to draw conclusions from such a small sample size—four of which are from the same book—these results largely support the Court's prior interpretation.  The phrase most often appeared in the context of judicial decision-making, courts generally, bar associations, or law enforcement.  Two concordance lines could be interpreted as referring to government generally, and two were unclear.  These limited exceptions seem to be outliers.

In short, there is essentially no evidence that either judges, lawyers, or speakers more generally used the term "administration of justice" to refer to legislative proceedings like the

certification of the electoral count. Instead, both professional and lay speakers overwhelmingly used this term to reference judicial proceedings or activities closely related to them. To be sure, corpus linguistics is but one tool in the interpretative toolbox. But "[i]ts foremost value may come in those difficult cases where . . . dictionaries diverge. In those cases, corpus linguistics can serve as a cross-check on established methods of interpretation (and vice versa)." *Wilson*, 930 F.3d at 440 (Thapar, J., concurring in part and concurring in the judgment). Even though dictionaries do not necessarily diverge here, corpus linguistics provide further evidence that the Government is stretching the Guideline beyond its natural meaning.

### 2.

The Government offers a different bit of context. It argues that the commentary to § 2J1.2 defines the administration of justice broadly enough to encompass the certification. *See* Gov't Mem. in Aid of Sentencing (Gov't Mem.) at 29.

To begin, query whether the commentary to a sentencing guideline is authoritative. *See, e.g.*, *United States v. Winstead*, 890 F.3d 1082, 1089 (D.C. Cir. 2018) (noting disagreement over this issue). The Supreme Court held in *Stinson v. United States* that the commentary should "be treated as an agency's interpretation of its own legislative rule." 508 U.S. 36, 44–45 (1993) (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). The Court explained that commentary which "interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Id.* at 38.

Yet other circuits have explained that *Stinson* should be applied with care. This is so because it rests on *Seminole Rock* (later called *Auer*) deference, which the Supreme Court recently clarified. *See generally Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). When *Stinson* was

decided, courts were far more willing to defer to agency interpretations of text. After *Kisor*, they must be more careful to reduce ambiguity using the standard tools of statutory interpretation before deferring. *See* 139 S. Ct. at 2414. "Congress has delegated substantial responsibility to the Sentencing Commission, but, as the Supreme Court emphasized in *Kisor*, the interpretation of [the Guidelines] ultimately 'remains in the hands of the courts.'" *United States v. Nasir*, 17 F.4th 459, 472 (3d Cir. 2021) (en banc) (quoting *Kisor*, 139 S. Ct. at 2420); *see also United States v. Riccardi*, 989 F.3d 476, 485 (6th Cir. 2021) ("*Kisor* must awake us from our slumber of reflexive deference to the commentary" (cleaned up)).

And the D.C. Circuit has suggested that courts should eschew deference to the Commission where the commentary expands the meaning of the text of the Guidelines themselves. *See Winstead*, 890 F.3d at 1092 ("[S]urely *Seminole Rock* deference does not extend so far as to allow [the Commission] to invoke its general interpretive authority via commentary . . . to impose such a massive impact on a defendant with no grounding in the guidelines themselves.").

But the Court need not wade into that debate. Even if § 2J1.2's commentary bound the Court, it supports a narrower interpretation of the "administration of justice" than the Government offers. The commentary to § 2J1.2 provides:

> "Substantial interference with the administration of justice" includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial Governmental or court resources.

U.S.S.G. § 2J1.2 cmt. n.1. The modifying phrase "substantial interference" appears only in the three-level enhancement. *Compare* § 2J1.2(b)(2), *with id.* (b)(1)(B) (eight-level enhancement referencing only the "administration of justice").

As it has in prior cases, the Government relies on the last portion of the definition, "the

unnecessary expenditure of substantial Governmental or court resources," to argue that the enhancement applies. *See* Gov't Mem. at 29. According to the Government, this part of the definition means that the "administration of justice" encompasses more than judicial proceedings. *See id*. Because the rioters' disruption of the electoral certification caused "unnecessary expenditure of substantial Governmental . . . resources," the argument goes, they substantially interfered with the administration of justice. *Id*. While the events of January 6 caused the Government to commit significant resources—evidenced in part by the number of cases charged in this district—this argument proves too much. If courts may enhance an obstruction-related sentence by eleven levels any time the Government can show that the offense caused unnecessary expenditure of its resources, "substantial interference with the administration of justice" could encompass just about anything. Indeed, the Government could theoretically trigger the enhancements at will.

The Government's reliance on the "unnecessary expenditure" clause also obscures the rest of the definition. In short, it fails to read that phrase in context. Substantial interference with the administration of justice also "includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence[.]" U.S.S.G. § 2J1.2 cmt. n.1. This portion of the definition fits the Court's textual interpretation of the "administration of justice" in Part III.A. The list refers to investigations, verdicts, and judicial determinations—all of which involve the coercive force of the state and the actual or potential determination of legal rights in judicial or enforcement proceedings.

Isolating the "unnecessary expenditure of substantial Governmental . . . resources" clause also cuts out the "or court" part of the phrase. That "Governmental" appears next to "court" in a

phrase about "resources" suggests that the term really refers to *prosecutorial* resources rather than the expenditure of resources by any public agency. *See* Scalia & Garner at 195–98 (explaining that words "associated in a context suggesting that [they] have something in common . . . should be given related meanings" under the canon *noscitur a sociis*). After all, a broad definition of "Governmental" would include court resources, rendering the phrase "or court" superfluous. *See id.* at 176–79 (explaining that under the surplusage canon, "courts must . . . lean in favor of a construction which will render every word operative, rather than one which may make some idle and nugatory" (citation omitted)). That the other portions of the definition also refer to judicial-like proceedings bolsters this conclusion.

More, the Government ignores another section of the commentary that lists exemplar offenses to which this Guideline applies. *See* U.S.S.G. § 2J1.2 cmt., Background. These offenses fit with the Court's definition of "administration of justice" in Part III.A. For example: "using threats or force to intimidate or influence a juror or federal officer; obstructing a civil or administrative proceeding; stealing or altering court records; unlawfully intercepting grand jury deliberations . . . [and] using intimidation or force to influence testimony [or] alter evidence[.]" *Id.* All the examples that the Commission provides evoke traditional notions of judicial or enforcement proceedings and are consistent with the Court's corpus linguistics analysis. None of them relate to a legislative proceeding.

True, the commentary cross-references § 1512, along with a slew of other statutes. *See* U.S.S.G. § 2J1.2 cmt, Statutory Provisions. But that does not mean that the three- and eight-point enhancements apply to *every* situation in which the Government charges § 1512(c)—only that they could apply at times. Indeed, the mine run of § 1512(c) cases may well qualify for the § 2J1.2(b)(1)(B) and (b)(2) enhancements. For there are many "official proceedings" that

involve the official application of force to decide legal rights, like a trial.  But the key here is that the electoral certification is not one such proceeding.  It does not qualify for these enhancements because it involves no judicial or quasi-judicial application of force to decide or maintain legal rights.

**C.**

Finally, precedent.  Seefried cites decisions that he claims limit the "administration of justice" to "judicial or grand jury proceedings."  Def.'s Mem. at 4.  The Government counters that other courts have applied the enhancement to proceedings that would not fit Seefried's "narrow definition."  Gov't Mem. at 30.

Seefried cites *United States v. Aguilar*, in which the Supreme Court construed the phrase "due administration of justice" in another section of the same statute, 18 U.S.C. § 1503.  *See* 515 U.S. 593, 598–99 (1995).  Section 1503 makes it a crime to "corruptly . . . influence[], obstruct[], or impede[], or endeavor[] to influence, obstruct, or impede, the due administration of justice[.]" 18 U.S.C. § 1503.  This particular clause in the statute follows other prohibited conduct, most of which pertain to judicial proceedings.  *See id.* (forbidding the influencing, intimidating, or impeding any juror or officer who may be "serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate," or injuring any such officer).

In *Aguilar*, the Court held that a man who made false statements to FBI agents—a potential grand jury witness—did not violate § 1503.  *See Aguilar*, 515 U.S. at 599.  The Court reasoned that the FBI agents were not an "arm of the grand jury" and that grand jury had not "even summoned them to testify."  *Id.* at 600.  Because the defendant did not know that his false statements were likely to affect the grand jury proceeding, the Court explained that he could not

18

be found guilty for "imped[ing] the due administration of justice." *Id.* at 599–601. Ultimately, *Aguilar*'s reasoning suggests that the "administration of justice" in § 1503 is analogous to a "judicial or grand jury proceeding." *Id.* at 599.

Seefried also cites various appellate decisions that follow *Aguilar* to interpret the "due administration of justice" in § 1503 to mean "interfering with the procedure of a judicial hearing or trial." *United States v. Richardson*, 676 F.3d 491, 502–03 (5th Cir. 2012); *see also United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) ("Section 1503 employs the term 'due administration of justice' to provide a protective cloak over all judicial proceedings."); *cf. United States v. Warlick*, 742 F.2d 113, 115–16 (4th Cir. 1984) ("[O]bstruction of the administration of justice requires . . . some act that will . . . thwart the judicial process.").

Admittedly, terms may carry different meanings in a statute versus a guideline. *See, e.g.*, *DePierre v. United States*, 564 U.S. 70, 88 (2011). But *Aguilar*'s reasoning, and that of the circuit courts following it, is still a building block in the wall of evidence supporting the reading that the "administration of justice" involves a judicial or quasi-judicial proceeding applying the force of the state to decide legal rights.

The cases the Government cites do not cast doubt on this Court's interpretation of the "administration of justice." *See* Gov't Mem. at 30. Indeed, many of its authorities involve judicial or investigative proceedings from which punishment could follow. *See, e.g.*, *United States v. Pegg*, 812 F. App'x 851, 860 (11th Cir. 2020) (defendant's action "prevented the government from prosecuting" another investigative target); *United States v. Atl. States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 200–04 (D.N.J. 2009) (defendants' actions obstructed agency's efforts to investigate a deadly accident); *United States v. Weissman*, 22 F. Supp. 2d 187, 194–98 (S.D.N.Y. 1998) (defendant withheld subpoenaed documents from an investigative congressional

committee and lied at his deposition).  And even the case it cites that is furthest from a judicial proceeding still involved a law enforcement investigation.  *See United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017) (affirming application of the three-level administration of justice enhancement where man absconded abroad with children and several federal agencies and agents worked for days to complete his seizure).  This Court's interpretation fits comfortably alongside these holdings.

Finally, though it is historical rather than legal precedent, recall that the phrase "administration of justice" appears in one of our seminal founding documents: the Declaration of Independence.  And it does so in the context of judicial proceedings.  In castigating King George III, Thomas Jefferson wrote:  "He has obstructed the Administration of Justice, by refusing his Assent to law for establishing Judiciary powers.  He has made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries."  *The Declaration of Independence* para. 8 (U.S. 1776).  In short, text, context, and precedent suggest that the Government reads the "administration of justice" too broadly.

\*   \*   \*

An inconsistency in the Government's litigating position also bears noting.  January 6 defendants have argued in motions to dismiss their indictments that they have not violated § 1512(c) because the statutory phrase "official proceeding" only references proceedings that involve the administration of justice, and the electoral certification does not.  *See, e.g.*, *United States v. Sandlin*, 575 F. Supp. 3d 16, 23–24 (D.D.C. 2021).  Seefried made the same argument here.  *See* Mot. to Dismiss at 2, ECF No. 36.

The Government has argued in opposition that § 1512(c) "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific" obstruction offense—

20

such as obstruction of the administration of justice.  *See* Opp'n to Mot. to Dismiss at 7–8, ECF No. 44.  Most judges in this district have agreed.  *See, e.g.*, *United States v. Montgomery*, 578 F. Supp. 3d 54, 61–65 (D.D.C. 2021) (explaining that Congress does not engage in the administration of justice).  The Government cannot have its cake and eat it too.  It would be incongruous for this Court to say pre-trial that the "official proceeding" of the electoral certification is more expansive than proceedings only involving the administration of justice, but then turn around at sentencing to say the opposite.

It is the Government's burden to prove that a sentencing enhancement applies.  *See United States v. Bapack*, 129 F.3d 1320, 1324 (D.C. Cir. 1997).  It has not done so here.

## IV.

The Court acknowledges that this is a close interpretative call.  If the Sentencing Commission had foreseen the Capitol breach, it may well have included "official proceeding" in the text of § 2J1.2.  But the Commission did not.  Given that courts should interpret the Guidelines using traditional tools of statutory interpretation, this Court declines to rewrite § 2J1.2 to say what it does not.  If the Commission wishes to expand the text of the Guideline to include official proceedings such as the electoral certification, "it may seek to amend the language of the guidelines by submitting the change for congressional review."  *Winstead*, 890 F.3d at 1092.

In the meantime, this Court may still consider the concerns underlying the Government's requests for these enhancements under the § 3553(a) factors at sentencing.  But for all of these reasons, the Court finds that Seefried did not obstruct, impede, or interfere with the "administration of justice" and that the enhancements in § 2J1.2(b)(1)(B) and (b)(2) are inapplicable.

**SO ORDERED**.


Dated:  October 29, 2022

_____
TREVOR N. McFADDEN, U.S.D.J.