UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HUNTER SEEFRIED,<br><br>Defendant. | Case No. 21-CR-287 (TNM) |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
FOR SENTENCING ADJUSTMENT**

The United States, by and through its attorney, the United States Attorney for the District of Colombia, respectfully submits this response to the defendant's Emergency Motion to Reduce Sentence based on the newly enacted U.S.S.G. § 4C1.1. ECF No. 164. For the following reasons, defendant's sentence should not be modified.

I.   **FACTUAL BACKGROUND**

On January 6, 2021, Seefried and his family, including his father and co-defendant Kevin Seefried, attended the "Stop the Steal" rally in Washington, D.C. Shortly before 2:00 p.m., Seefried and his father entered the restricted Capitol grounds, then climbed up a wall to access a stairwell running alongside scaffolding, which provided access to the Upper West Terrace of the Capitol building. A crowd of rioters had gathered there and were temporarily held back by a line United States Capitol Police ("USCP") officers manning bike rack barricades. At approximately 2:09 p.m., rioters broke through that line and the mob surged towards the Capitol building. Slightly more than a minute later, Seefried and his father ascended the stairwell and marched with the mob of rioters to the Capitol building.

Seefried sped past other rioters as he made his way to the Senate Wing Door, and was in the group of rioters immediately outside of the building as it was breached at approximately 2:12

p.m. Seefried witnessed other rioters use various objects—including a police riot shield and a 2x4 piece of lumber—to break the large windows just to the right of the Senate Wing Door, then approached the window and used his fist to clear the glass that remained in one of the broken windowpanes, opening the way for other rioters to enter the Capitol building.

Seefried himself then jumped up to the window's ledge. While crouched in the window, Seefried observed a uniformed USCP officer standing inside the building. The officer pointed a can of pepper spray towards Seefried, but Seefried ignored the officer's warning to not enter the building and instead pulled himself through the window, becoming the fourth rioter to set foot inside the Capitol building that day.  Seefried then headed north, again toward the front of the crowd, and encountered USCP Officer Eugene Goodman.  As Officer Goodman led the mob up the East Grand Staircase, the rioters berated him, yelling threats such as "We're here for you," "Keep running, motherfucker," and "He's one person. We're thousands."  Government Trial Exhibit 504.  As Officer Goodman backed up and turned towards the Ohio Clock Corridor, Seefried was positioned at the front of the pack, with only three rioters between him and the retreating officer.  Government Trial Exhibit 506.

Seefried then circled back to regroup with his father, and continued into the Ohio Clock Corridor, where additional USCP officers had formed a police line to prevent the rioters from reaching the entrance to the Senate Chamber.  There, rioters continued to confront the officers, making statements such as  We're ready for war," "We're ready to take down this place," "We're ready to take down this building," "We're ready to take over."  Officer Goodman recalled that Seefried "appear[ed] to the front of the line, sort of [came] to the front of the line at one point." Trial. Tr. at 128, 06/13/2022. Officer Goodman told Seefried to leave, stating "you need to get out now," but Seefried told him "no." *Id.*  USCP Officer Brian Morgan noted Seefried's threatening

demeanor as well, recalling that Seefried had his "fists clenched and [was] pacing back and forth a little bit." Trial. Tr. at 214-215, 06/13/2022. Similarly, USCP Sgt. Brandon Kiely observed Seefried trying to engage with the police officers in the line. Trial. Tr. at 101-102, 06/14/2022. During the approximately 20 minutes that Seefried was in the Ohio Clock Corridor, he was agitated and repeatedly placed himself up against the police, attempting to engage with the officers. *See* Gov't Sent. Mem., ECF No. 115, at 17-23. He and his father left the Ohio Clock Corridor—and the Capitol building—only after hearing that they and other rioters would be tear gassed and arrested. *See* Government Trial Exhibit 301 at 28:25-28:56.

On June 15, 2022, following a two-day bench trial, Seefried was convicted of five counts: Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count 1); Entering or Remaining in any Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count 2); Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2) (Count 3), Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 4); and Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 5). The Court acquitted Seefried of three counts: Entering or Remaining in a Restricted Building or Grounds with Physical Violence Against Property, in violation of 18 U.S.C. § 1752(a)(4) (Count 6); Destruction of Government Property and Aiding and Abetting, in violation of 18 U.S.C. §§ 1361 and 2 (Count 7); and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count 8).

On October 24, 2022, this Court sentenced Seefried to 24 months of imprisonment, followed by one year of supervised release. Seefried's projected release date is currently April 3, 2024.

## II. RETROACTIVE APPLICATION OF U.S.S.G. § 4C1.1

U.S.S.G. § 4C1.1 provides for a two-level reduction for offenders with no criminal history points who are not subject to any of ten exclusionary criteria, including:

- § 4C1.1(2): the defendant did not receive an adjustment under § 3A1.4 (Terrorism);
- § 4C1.1(3): the defendant did not use violence or credible threats of violence in connection with the offense;
- § 4C1.1(4): the offense did not result in death or serious bodily injury;
- § 4C1.1(7): the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense).

Section 4C1.1 may be applied retroactively to previously sentenced inmates, pursuant to U.S.S.G. § 1B1.10. Such a reduction may occur as provided in 18 U.S.C. § 3582(c)(2), which provides:

> [I]n the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Accordingly, a reduction pursuant to U.S.S.G. § 1B1.10 is not mandatory. Instead, a "court *may* reduce the term of imprisonment, after considering the factors set forth in section 3553(a)." 18 U.S.C. § 3582(c)(2) (emphasis added). Additionally, any proceeding under Section 3582(c)(2) is not a full resentencing, so a court is not permitted to reconsider other sentencing determinations left unaltered by the Section 4C1.1 amendment. *Dillon v. United States*, 560 U.S. 817, 825-826 (2010); U.S.S.G. § 1B1.10(a)(3).

A court considering a motion for a sentence reduction due to § 4C1.1 must follow a two-step process. *Id.* at 826. First, the court must determine whether the defendant is eligible for a

sentence reduction. A defendant is only eligible under § 4C1.1 reduction if: (1) the defendant has no criminal history points; (2) the defendant is not subject to any of the exclusionary criteria; (3) the amended guidelines range is lower than the range applied at the original sentencing hearing; and (4) the defendant did not previously receive a sentence at or below the bottom of the now-amended range other than for providing substantial assistance. *See* U.S.S.G. §§ 1B1.10, 4C1.1; *Dillon*, 560 U.S. at 827.

Even if step 1 is satisfied, a sentencing reduction is not required. Instead, § 1B1.10 directs that before reducing a defendant's sentence, the court must "consider the factors set forth in 18 U.S.C. § 3553(a) in determining … whether a reduction in the defendant's term of imprisonment is warranted" as well as "the extent of such a reduction." U.S.S.G. § 1B1.10 app. note 1(B)(i), (ii); *see also id.* Background ("The authorization of such a discretionary reduction ... does not entitle a defendant to a reduced term of imprisonment as a matter of right.").

In particular, the Court must consider public safety considerations, and may consider information regarding the post-sentencing conduct or situation of the defendant, whether positive or negative. *See*, *e.g.*, *United States v. Darden*, 910 F.3d 1064, 1068 (8th Cir. 2018). Section 1B1.10 application note 1(B)(ii) directs that "[t]he court shall consider the nature and seriousness of the danger to any person or the community that may be posed by a reduction in the defendant's term of imprisonment." Application note 1(B)(iii) further directs that "[t]he court may consider post-sentencing conduct of the defendant that occurred after the imposition of the original term of imprisonment." That means the Court may, but is not required, to consider the defendant's post-sentencing rehabilitation, if any. *See United States v. Rodriguez-Rosado*, 909 F.3d 472, 481 (1st Cir. 2018); *United States v. Banderas*, 858 F.3d 1147, 1150 (8th Cir. 2017). Such conduct would include social media posts and other statements relating to the Capitol riot on January 6, 2021.

If the court decides in its discretion to grant a reduction in sentence, it generally may not reduce the term of imprisonment to a term that is less than the minimum of the new guideline range. U.S.S.G. § 1B1.10(b)(2)(A). Thus, the Court may not reduce the sentence below the range provided by the amended guideline, and "in no event may the reduced term of imprisonment be less than the term of imprisonment the defendant has already served." U.S.S.G. § 1B1.10(b)(2)(C).

### III.   NO SENTENCING REDUCTION IS WARRANTED

**A. Hunter Seefried is not eligible for a reduction under § 4C1.1.**

Seefried is not eligible for the sentencing reduction under the Section 4C1.1 amendment. Although he has no criminal history points, *see* PSR ¶¶ 50-57, Seefried's conduct on January 6, 2021 involved credible threats of violence, *see* U.S.S.G. § 4C1.1(3).

Seefried points to his acquittal on Counts 6, 7, and 8 as proof that he did not use violence or credible threats of violence in connection with his offenses. ECF No. 164 at 3-4. And while he concedes that he was part of a mob whose members engaged in acts of violence, he asserts that he himself did not engage in any conduct that would be disqualifying under Section 4C1.1(3). *Id*. at 4-6. This argument ignores the threat of violence presented by Seefried's own conduct on January 6. Seefried joined, and was at the front of, a pack of rioters who chased a police officer through the halls of Congress. *See* Sent. Tr. at 50, 10/24/22. While he may not himself have shouted specific, violent threats, his position and continued pursuit were themselves threatening to Officer Goodman. *See United States v. Bauer,* No. 21-cr-386 (TNM), ECF No. 195 at 6 (defining a credible threat of violence under Section 4C1.1 as "a believable expression of an intention to use physical force to inflict harm").[1] Similarly, Seefried spent more than 20 minutes in the Ohio Clock

---

[1] The government notes that the defendant's proffered definitions of "violence" and "credible threats of violence" are derived from case law in another Circuit interpreting specific offense characteristics for the unlawful manufacturing, importing, exporting, or trafficking of narcotics;

Corridor, an incredibly vulnerable and volatile area, where he displayed visible signs of agitation and aggression and repeatedly approached and attempted to engage with the police line standing between the rioters and the Senate Chamber.  To Officer Goodman and the officers in the police line in the Ohio Clock Corridor, Seefried presented a very real threat of violence—that is, a clear, believable intention to use physical force to inflict harm—against them and against anyone in the Senate Chamber behind them, including members of Congress.  Viewing Seefried's actions in the overall context of January 6th's violence illustrates just how extreme and threatening his conduct was.  *See id.* at 7 ("Given this context [of a large crowd of rioters who had crossed into a restricted area and forced officers to retreat], the outnumbered police officers … would have reasonably believed that [defendant's] violence threats meant that she would harm them, possibly with the aid of other rioters…. A mob is dangerous in part because it can quickly escalate into violent actions that no member of the mob would have or could have attempted alone."); *United States v. Andrulonis*, No. 23-cr-085 (BAH), Sent. Tr. at 11-12 ("In evaluating whether credible threats of violence were posed by the defendant's offense conduct, to my mind, the context matters very critically.  In other words, evaluating a defendant's offense conduct requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions. So the fact that this defendant is not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction.").

---

attempt or conspiracy.  *See* ECF No. 164 at 4-5.  Moreover, that provision does not use identical language to Section 4C1.1.  Regardless, chasing a police officer who feared for his safety clearly satisfies even the defendant's definition of a credible threat of violence.

### B. Even if the Court determines that § 4C1.1 applies, it should not reduce Seefried's sentence.

"The grant of authority to the district court to reduce a term of imprisonment is unambiguously discretionary," even when the guideline range is actually reduced. *United States v. Vautier*, 144 F.3d 756, 760 (11th Cir. 1998). A district court has "substantial discretion" in deciding whether to reduce a sentence. *United States v. Young*, 555 F.3d 611, 614 (7th Cir. 2009). Accordingly, many courts have denied sentence reductions even in situations where guideline amendments lowered the sentencing ranges.[2] Here, the Section 3553(a) factors counsel against granting a sentence reduction.

In this case, the Court calculated Seefried's offense level to be 14, declining to apply a 3- point enhancement under U.S.S.G. § 2J1.2(b)(2) and an 8-point enhancement under U.S.S.G. § 2J1.2(b)(1)(B), on the grounds that the electoral certification did not involve the "administration of justice" as that term is used in the Guidelines. *See* Sent. Tr. at 23, 10/24/22; *United States v. Seefried*, 21 Cr. 287 (TNM), 639 F.Supp.3d 8 (D.D.C. 2022). This resulted in a Guidelines range

---

[2] *See, e.g.*, *United States v. Wilson*, 716 F.3d 50, 53 (2d Cir. 2013) (denial of sentence reduction was not an abuse of discretion, though earlier sentence reduction had been granted despite defendant's prison misconduct, and defendant had not engaged in any new prison misconduct); *United States v. Styer*, 573 F.3d 151, 154-55 (3d Cir. 2009) (denial based on nature of original criminal conduct); *United States v. Stevenson*, 332 F. App'x 261 (6th Cir. 2009) (reduction denied despite eligibility under amendment, based on disciplinary infractions in prison, and lengthy criminal record); *United States v. Dunn*, 728 F.3d 1151, 1159-60 (9th Cir. 2013); *United States v. Arceneaux*, 297 F. App'x 819 (10th Cir. 2008) (reduction denied due to disciplinary record in prison); *United States v. Melton*, 2008 WL 1787045 (W.D.N.C. 2008) (denial based on nature of offense); *United States v. Craig*, 2008 WL 1775263 (W.D.N.C. 2008) (denial based on the facts of the case); *United States v. Suell*, 2008 WL 2845295 (N.D. Tex. 2008) (motion denied because defendant benefitted from a favorable plea agreement in which charges were dismissed and the sentence was reduced); *United States v. Reynolds*, 2008 WL 2367254 (S.D. W. Va. 2008) (motion denied because defendant's criminal conduct was "nothing short of egregious"), aff'd, 309 F. App'x 703 (4th Cir. 2009). *See also United States v. Marion*, 293 F. App'x 731 (11th Cir. 2008) (unpublished) (district court's consideration of the defendant's criminal history was proper, when denying a reduction motion, even though this was the same factor it considered at his original sentencing hearing).

of 15-21 months.  But, the Court then varied upward, imposing a sentence of 24 months of imprisonment.  In doing so, the Court cited several aggravating factors: Seefried's participation in the mob that chased Officer Goodman, his early entry into the Capitol building through a window he had witnessed being broken, and the substantial interference with the electoral certification proceeding for which Seefried and his fellow rioters were responsible.  Sent. Tr. at 53-55.  In imposing this sentence, the Court noted that "the guidelines are voluntary and are frankly not well situated to this particular situation," and indicated that it would have imposed the same sentence regardless of the applicability of Sections 2J1.2(b)(1)(B) and/or 2J1.2(b)(2).  Sent. Tr. at 55.

The factors cited by the Court continue to reflect the seriousness of Seefried's offenses and weigh against a reduction in his sentence.  Throughout his time in the restricted area around the Capitol and inside the Capitol building itself on January 6, 2021, Seefried strove to be at the front of the action: He and his father rushed to and up the side of the Northwest stairs.  They sped through the mob on the Upper West Terrace until they were immediately outside the Senate Wing Doors as they were being breached – in Seefried's own words, "up to the front … [where] all the commotion was," Government Trial Exhibit 301 at 55:35-55:48.  Seefried disregarded a USCP officer attempting to keep the mob outside using pepper spray.  He was the first rioter to climb up on the ledge of the broken out window on the south side of the Senate Wing Doors, and the fourth to enter the Capitol building.  Once inside, he barely hesitated before moving deeper into the building and again placed himself at the front of the angry, threatening mob that chased Officer Goodman to the Ohio Clock Corridor.  And he remained in the Ohio Clock Corridor for approximately 20 minutes, as USCP officers used their own bodies to keep rioters from advancing into the Senate Chamber.  The Court's sentence appropriately reflects all of this conduct.

In addition, the 3553(a) factors counsel against a sentence reduction for the further reason that the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers, causing serious bodily injury in many cases. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

Finally, the government notes that the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is

accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

Thus, due to the unique nature of the January 6 riot, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless deny a sentence reduction. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.[3]

---

[3] If the Court does decide in its discretion to grant the defendant's motion, the government requests that the Court delay release by 10 days in order to allow time for the Bureau of Prisons to process the release, as recommended by the Committee on Criminal Law of the Judicial Conference of the United States in its January 25, 2024 memorandum.

## IV. CONCLUSION

For all these reasons, the defendant's motion should be denied.

                                        Respectfully submitted,

                                        MATTHEW M. GRAVES
                                        United States Attorney
                                        D.C. Bar No. 481052

By:    */s/ Benet J. Kearney*
        BENET J. KEARNEY
        Assistant United States Attorney
        NY Bar No. 4774048
        26 Federal Plaza
        New York, New York 10278
        Benet.Kearney@usdoj.gov
        (212) 637-2260

        BRITTANY L. REED
        Assistant United States Attorney
        LA Bar No. 31299
        650 Poydras Street, Ste. 1600
        New Orleans, LA 70130
        Brittany.Reed2@usdoj.gov
        (504) 680-3031

**CERTIFICATE OF SERVICE**

On this 9th day of February 2024, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

/s/ *Benet J. Kearney*
BENET J. KEARNEY
Assistant United States Attorney