UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **United States of America,**<br><br>v.<br><br>**Hunter Seefried,**<br><br>Defendant. | Case No. 21-cr-287-2 (TNM) |

**Reply in Support of Emergency Motion to Reduce Sentence**

The Bureau of Prisons has recently adjusted Mr. Seefried's projected release date to April 3, 2024.[1] Hence, the parties are disputing whether Mr. Seefried should receive a 1.5-month reduction to his sentence. The amount of pages and effort the government has dedicated to this case (along with other January 6 cases seeking the benefit of Amendment 821)[2] is as absurd as it is meritless. The government makes only two arguments that necessitate a reply: First, it claims that Mr. Seefried is ineligible for a zero-point offender adjustment under U.S.S.G. § 4C1.1 because he purportedly engaged in violence or credible threats of violence. Second, the government claims that the Court should deny Mr. Seefried's request for a sentence reduction under the § 3553(a) factors. Each will be addressed below.

---

[1] *See* Bureau of Prisons, *Inmate locator*, available at https://www.bop.gov/inmateloc/ (reporting an individual's projected release date).

[2] This case is not an outlier. In *United States v. Hernandez*, for example, the government filed an opposition in a January 6 case where only a 3-day reduction was in dispute. Judge Kollar-Kotelly ultimately granted the request, demonstrating the unreasonableness of the government's position. *See* No. 21-cr-445 (CKK), ECF No. 65 at 9 (D.D.C. Jan. 31, 2024) ("[T]he government has not proffered any convincing reason why the Court should not reduce Defendant's sentence, especially in this case when the only benefit Mr. Hernandez will receive is de minimis—a release from incarceration on February 1, 2024 as opposed to February 4, 2024).

1

### A. Mr. Seefried is eligible for a reduction under § 4C1.1.

The government argues that Mr. Seefried is ineligible for a sentence reduction because his "conduct on January 6, 2021 involved credible threats of violence, *see* U.S.S.G. § 4C1.1(3)." Gov't Opp'n at 6. In so arguing, it identifies two specific incidents: First, it highlights that "Seefried joined, and was at the front of, a pack of rioters who chased a police officer [Officer Goodman] through the halls of Congress." *Id.* Second, it notes that "Seefried spent more than 20 minutes in the Ohio Clock Corridor . . . where he displayed visible signs of agitation and aggression and repeatedly approached and attempted to engage with the police line standing between the rioters and the Senate Chamber." *Id.* at 7. Even accepting the government's description of these events as accurate—which is a dubious proposition at best—neither of these events (or any of Mr. Seefried's actions on January 6) have the necessary degree of aggression or intent to qualify as "credible threats of violence" under U.S.S.G. § 4C1.1. *See United States v. Yang*, No. 23-cr-100 (JDB), ECF No. 38 at 8 (D.D.C. Feb. 9, 2024) (applying zero-point offender adjustment to January 6 defendant—who made physical contact with officers, pumped his fists in the air, grabbed an officer's baton, rushed toward a line of officers, and obstructed officers' efforts to clear the Capitol—after finding "that Yang did not act with the degree of aggression necessary to fairly characterize his actions as 'violence'").[3]

---

[3] *See also* Gov't Sent'g Mem. in *Yang*, ECF No. 34, at 6-12 (highlighting (i) "Yang can be seen on CCTV pumping his fists in the air," (ii) "[d]espite the advancing line of police officers, Yang refused to move back or leave the Rotunda"; (iii) Yang "moved towards the line of police officers" where he "was involved with several confrontations with the officers"; (iv) "Yang rushed directly towards the line of officers and joined with other rioters in aggressively confronting them and obstructing their efforts to clear the U.S. Capitol building," and (v) Yang "physically grabbed one officer's wrist while the officer was working to clear the Rotunda of rioters").

Beginning with the first, there is no dispute that Mr. Seefried did not physically touch Officer Goodman. And the government acknowledges that Mr. Seefried did not himself "shout[] specific, violent threats" at him. Gov't Opp'n at 6. The government's sole argument is that Mr. Seefried's "position and continued pursuit were themselves threatening to Officer Goodman." *Id*. But the government's trial exhibit 506 captures the incident and undermines its argument. That video shows Mr. Seefried casually walking up the stairs in an overtly non-confrontational way, positioned several individuals away from Officer Goodman:



Indeed, Mr. Seefried is positioned behind an individual who consistently had his hands up in a non-threatening gesture:[4]



As the video shows, Mr. Seefried's conduct relating to this incident lacks the type of aggression that is necessary to qualify as "violent." His casual walking and peering around the Capitol in an exploratory fashion also undercuts any credible argument that he had an intent to injure Officer Goodman or others. *See United States v. Bauer*, No. 21-cr-386 ECF No. 195 at 4, 6 (D.D.C. Jan. 29, 2024) ("Contemporary dictionaries define 'violence' as '[t]he use of physical force,' typically 'accompanied by fury, vehemence, or outrage'" and "'threat' is defined as 'an expression *of an intention* to inflict evil, injury, or damage on another'" (emphasis added)); *Yang*, No. 23-cr-100 (JDB), ECF No. 38 at 7 (finding Yang's contact with the officers was not

---

[4] As the video continues, it appears Mr. Seefried is not only behind an individual with his hands up in a non-threatening gesture, but also followed by two individuals from the media taking photos of the event—*i.e.*, he is sandwiched in a smaller group of overtly non-confrontational people.

"violent," given that it was not "accompanied by 'fury, vehemence, or outrage' or the like"; nor was his conduct "made with an intent to harm").

The second incident relating to Mr. Seefried's conduct in the Ohio Clock Corridor suffers from the same defects. The government claims that Mr. Seefried spent more than 20 minutes in that location, "where he displayed visible signs of agitation and aggression and repeatedly approached and attempted to engage with the police line standing between the rioters and the Senate Corridor." Gov't Opp'n at 7; *see also id.* at 3 ("During the approximately 20 minutes that Seefried was in the Ohio Clock Corridor, he was agitated and repeatedly placed himself up against the police, attempting to engage with the officers."). The government's rhetoric here exceeds reality.

The government's trial exhibit 414 captures this incident. That video shows Mr. Seefried walking around the Corridor in a non-threatening and often exploratory manner. *See id.* At no point did he touch officers or attempt to break the police line. On several occasions, he is positioned in the back of the crowd or on the side of the Corridor, such as below where he is seen leaning on the wall near a bust:



*Id.* Mr. Seefried occasionally walks through the crowd and appears to have a non-threatening conversation with officers:



*See* Gov't Tr. Ex. 510.

On several occasions, he is captured taking "selfies" and smiling for a photographer:





*See* Ex. 414.  After roughly twenty minutes, he voluntarily exits the Corridor without incident.

*See id.*

7

The government highlights USCP Officer Morgan's testimony that Seefried had "his fists clenched and pac[ed] back and forth a little bit." *See* Gov't Opp'n at 3. Putting aside the fact that the "fists clenched" testimony is uncorroborated by the surveillance footage—except, of course, when Mr. Seefried has his fist clenched to give a "thumbs up" and smile at the photographer above, *see* Gov't Tr. Ex. 414 at 2:31:39 PM—the government omits Officer Morgan's subsequent statement that he "personally didn't have any contact with [Mr. Seefried]" and "couldn't hear" him talking with other officers because "[h]e was too far away." ECF No. 215 at 214-16. "Similarly," the government claims that "USCP Sgt. Brandon Keily observed Seefried trying engage with the police officers in the line," Gov't Opp'n at 3, but omits incredibly material information: *that no evidence indicated those discussions were threating and that Officer Keily even testified that Mr. Seefried "didn't strike [him] as aggressive in comparison to the rest of the rioters."* *See* ECF No. 111 at 102.

Stripped of its rhetoric, the government's argument amounts to a thinly veiled attempt to repackage its "broad-guilt-by-association interpretation of § 4C1.1." *United States v. Bauer*, No. 21-cr-386 (TNM), ECF No. 195 at 9 (D.D.C. Jan. 29, 2024). That is, even though it recognizes Mr. Seefried did not himself use physical violence or make threatening statements, he was part of a mob that collectively contributed to the overall violence and intimidating environment that day. But courts in this district to have addressed this issue—including this one—have uniformly rejected the "government's violence-by-presence theory of § 4C1.1(a)(3)." *See, e.g.*, *Yang*, No. 23-cr-100 (JDB), ECF No. 38 at 9 (rejecting government's interpretation and joining "the view of at least six other judges in this District," including Judges McFadden, Kollar-Kotelly, Friedrich, Mehta, Howell, and Boasberg). The same reasoning and result from those cases

8

applies here.  Because Mr. Seefried did not himself engage in violence, make credible threats of violence, or have the intent to harm others, he is eligible for a sentence reduction under U.S.S.G. § 4C1.1.

**B.  Nothing in § 3553(a) counsels against a sentence reduction under § 4C1.1.**

Although true that even if a defendant is eligible for a retroactive amendment, a court may still refuse to apply it, the government fails to identify any persuasive reason for why Mr. Seefried should not receive the benefit of the retroactively applicable Amendment 821.  At sentencing, this Court believed "there are significant factors here in [Mr. Seefried's] favor . . . and that stands in contrast to other defendants [the Court has] sentenced for felonious conduct on January 6th."  ECF No. 128 at 51.  It recognized that Mr. Seefried's actions were "a complete aberration for [him]."  *Id.*  It underscored that Mr. Seefried has "no criminal history, no association with extremist groups, and there's no evidence that [he] had been planning to do anything like this before hand."  *Id.*  The Court also noted his "good employment record and the many letters submitted on [his] behalf that testify to [his] good character," his youth, and found his "statements of remorse" to be "probably the most sincere and the most affecting statements of anyone [the Court has] sentenced for behavior on January 6th in quite a while."  *Id.* at 52.

Since Mr. Seefried's sentencing, the only § 3553(a) factors that have changed are his applicable guideline range and post-sentencing conduct.  Both strongly support a sentence reduction.  If Part B of Amendment 821 had been in force when he was sentenced, his guideline range would have been 10-16 months instead of 15-21 months.  The government attempts to minimize the importance of the guidelines in this case, *see* Gov't Opp'n at 9, ignoring not only

the considerable "anchoring effect" of the guidelines,[5] but also this Court's own words. This Court determined that Mr. Seefried's "participation in the mob that chased Officer Goodman is an aggravating factor that *demands some additional punishment over the guideline range I calculated*." *Id.* at 53 (emphasis added). The Court ultimately concluded that three months higher than the range it had calculated (*i.e.*, a sentence of 24 months with a range of 15-21 months) was appropriate before. But today, because the range is 10-16 months, maintaining Mr. Seefried's current sentence would amount to an upward variance of eight months, which is in no way warranted for Mr. Seefried's conduct. Instead, "some additional punishment" over the correct guideline range today would result in a sentence of around 18 months, or time served.

Indeed, an 18-month sentence is compelled by this Court's prior reasoning. When determining Mr. Seefried's sentence, the Court further stated that, even though it did not apply, the "substantial interference three-level enhancement [under U.S.S.G. §2J1.2(b)(2)] is

---

[5] "Practically speaking, applicable Sentencing Guidelines provide a starting point or 'anchor' for judges and are likely to influence the sentences judges impose." *See United States v. Turner*, 548 F.3d 1094, 1099 (D.C. Cir. 2008). The "gravitational pull of the Guidelines appears to be so strong that the change from mandatory to advisory Guidelines has had little to no impact on the average length of federal sentences." Hon. Mark W. Bennett, *Confronting Cognitive 'Anchoring Effect' And 'Blind Spot' Biases In Federal Sentencing: A Modest Solution For Reforming A Fundamental Flaw*, 104 J. Crim. L. & Criminology 489, 533-34 (2014) (citing U.S. Sent'g Comm. data); *United States v. Ingram*, 721 F.3d 35, 40 (2d Cir. 2013) (Calabresi, J., concurring) (discussing how "anchoring effects" influence judgments and noting that the court "cannot be confident that judges who begin" at a higher guidelines range "would end up reaching the same 'appropriate' sentence they would have reached" if they started from a lower guidelines range). The most troubling fact about cognitive anchoring is not that it exists on a subconscious level; rather, it is that people routinely deny that anchoring impacted their judgments when, in fact, "substantial anchoring effects were found." *See, e.g.*, Bennett, 104 J. Crim. L. & Criminology at 499 and 529 (discussing studies from Timothy D. Wilson et al., *A New Look at Anchoring Effects: Basic Anchoring and Its Antecedents*, 125 J. Experimental Psychol. 387 (1996)). Hence, "even if judges [or prosecutors] become aware of how the guidelines cognitively anchor their sentencing practices, they are likely to deny its existence in specific cases." *Id.* at 529.

relevant," and ultimately found "an upward variance equal to the substantial interference enhancement would be appropriate in any event." *Id.* at 54-55. Following this Court's prior reasoning, had Part B of Amendment 821 existed when Mr. Seefried was sentenced, and with the 3-level substantial interference upward variance, his total offense would have been 15, resulting in a guideline range of 18-24 months. Hence, Mr. Seefried merely asks the Court to convert what was essentially a low-end guideline sentence under the old guidelines with this Court's substantial interference variance (24 months with a range of 24-30 months) to a low-end guideline sentence under the now-applicable guidelines with the Court's substantial interference variance (18 months with a range of 18-24 months).

Mr. Seefried's post-sentence conduct only further supports a sentence reduction. While incarcerated, he has been a model inmate. He has earned his GED. *See* Ex. 1 (BOP Records) at 3. He has taken numerous education classes. *Id.* He has worked in various capacities, including in maintenance and the facilities department. *Id.* at 4. He has also prepared for life after prison through earning forklift and flagger certificates. *Id.* at 3. Although "[i]t is not unusual for inmates to receive reprimands in the prison context," *United States v. Greene*, 561 F. Supp. 3d 1, 16 (D.D.C. 2021), Mr. Seefried has none. *See id.* at 5. The BOP considers him to be a "low" recidivism risk and security risk and has accordingly already transferred him to a halfway house. *See id.* at 1. In short, the only § 3553(a) factors that have changed since this Court sentenced Mr. Seefried are his now-applicable guideline range (which obviously supports a sentence reduction) and his post-sentence conduct (which also supports a sentence reduction). He is thus deserving of receiving the retroactive benefits of Amendment 821.

The government suggests that January 6 defendants are somehow outside the universe of

11

cases captured by Part B of Amendment 821 because it was "based on recidivism data for offenders released in 2010" and "there is no reason to believe this historical data is predicative of recidivism for defendants who engage in acts of political extremism on January 6." Gov't Opp'n at 10. As Judge Bates recently recognized, however, "[t]his argument fails for multiple reasons." *See Yang*, No. 23-cr-100 (JDB), ECF No. 38 at 9.

*First*, "speculation about the underlying analysis behind a Guidelines amendment is not a valid basis to disregard the Guidelines as enacted." *Id.* at 10.

*Second*, "the Sentencing Commission (and Congress) had almost three years after January 6 to craft a carveout excluding January 6 defendants from § 4C1.1's potential benefit but did not do so." *Id.* It is disingenuous to suggest that the Commission somehow overlooked January 6 defendants given that the events of January 6 have dominated the news for the past three years and the Sentencing Commission is headquartered in Washington, D.C.

*Third*, "there is no indication that § 4C1.1's animating rationale does not hold true in this context—*i.e.*, that despite the unprecedented nature of January 6, rioters with zero criminal history points who meet the other criteria may still be less likely to recidivate than those with prior criminal records." *Id.* Part B was passed because recidivism data showed that *all* zero-point offenders differed meaningfully from those with countable criminal history. It did not matter their crime. If they had zero points, across the board, they were less likely to recidivate. *See* U.S.S.G. Supp. to App. C, Amendment 821, Reason for Amendment.[6] The government fails

---

[6] According to the Commission's Reasons for Part B of Amendment 821: "Recidivism data analyzed by the Commission shows that offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including offenders with one criminal history point. *See* U.S. Sent'g Comm'n, *Recidivism of Federal Offenders Released in 2010* (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-

12

to identify what is so unique about January 6 defendants that they would skew otherwise universally true data.

*Finally*, any claim that the data does not hold true for Mr. Seefried in particular is immediately undermined by his perfect post-sentence conduct.  He plainly fits within the limited class of zero-point offenders that the Commission determined should receive the retroactive benefit of Amendment 821.  In the end, the government is attempting to supplant the Commission's reasoned judgment and make Amendment 821 neither applicable nor fully retroactive to a whole group of people—specifically, under the government's view, all January 6 offenders should be categorically excluded.  But the time to make a policy argument against this retroactive amendment has passed.

## Conclusion

For the above reasons, Mr. Seefried respectfully requests that the Court grant his motion and reduce his sentence to time served, thereby modifying his projected release date from April 3, 2024, to immediate release.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
BENJAMIN FLICK
Research & Writing Attorney
Federal Public Defender's Office
625 Indiana Ave, NW, Suite 550
Washington, D.C. 20004

---

released-2010. Among other findings, the report concluded that zero-point offenders were less likely to be rearrested than one-point offenders (26.8% compared to 42.3%), the largest variation of any comparison of offenders within the same Criminal History Category." U.S.S.G. Supp. to App. C, Amendment 821, *Reason for Amendment*.